## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **VIVIAN GERAGHTY**, <br><br> *Plaintiff*, <br><br> v. <br><br> **JACKSON LOCAL SCHOOL DISTRICT BOARD OF EDUCATION**; **CHRISTOPHER DILORETO**, Superintendent of Jackson Local School District, in his official capacity; **MONICA MYERS**, Director of Curriculum, Instruction, and Assessment at Jackson Local School District, in her official capacity; **KACY CARTER**, Principal of Jackson Memorial Middle School, in his official capacity, <br><br> *Defendants.* | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **Case No. 5:22-cv-2237** |

### INTRODUCTION

1. Throughout the entire United States, and much of the world, a debate rages on the very nature of human identity and existence. Medical doctors and psychiatrists, school boards and teachers, politicians and citizens, parents and children are all engaged in the debate about what makes a person a man, a woman, a boy, a girl, or even whether those categories themselves have any meaning at all.

2. The Constitution guarantees a freedom of thought that includes a freedom to differ. "But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *West Va. Bd.of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). There are perhaps no questions that "touch the

heart of the existing order" more than those concerning the nature of human existence itself.

3.     The Constitution protects this freedom to differ, in part, by prohibiting the government from adopting and enforcing a set of approved views on these matters in America's public schools. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.*

4.     Defendants have abandoned this guiding light and adopted one particular view on this subject: that a person's subjective identity determines whether a person is male or female, not a person's sex. Compounding their unlawful adoption of an orthodoxy in this area, they have created and implemented a Policy requiring teachers, including Plaintiff Vivian Geraghty, to mouth her own support of Defendants' views by forcing her, as a condition of keeping her job as a public school teacher, to participate in the "social transition" of children in her class.

5.     Ms. Geraghty has a different view of this fundamental matter, informed by her scientific understanding and her Christian faith. When she was informed that two of her students were asking to be addressed by different names and/or pronouns to signify that they had "transitioned" to a gender that was inconsistent with their sex, and instructed by a school official to personally participate in that "social transition," she went to Defendant Kacy Carter in the hope of finding a way to move forward consistent with her conscience and her professional obligations.

6.     But as soon as Defendants found out that Ms. Geraghty had a religious basis for resisting their attempt to implement an orthodoxy, they forced her to resign. Within two hours of being notified that Ms. Geraghty had reservations about

their approach to the issue, without there ever being any complaint from a student or disruption of any school services, Defendants ejected her from the school.

7.      Because no interest justifies the state's treatment of Ms. Geraghty—indeed, the very nature of free speech, free exercise of religion, and freedom from state-enforced orthodoxy on fundamental matters condemns the state's attempt to purge contrary views from its schools—she brings this Complaint for injunctive, declaratory, and compensatory relief.

## JURISDICTION & VENUE

8.      This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

9.      This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state law claim made herein pursuant to 28 U.S.C. § 1367.

10.      This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

11.      Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) and Local Rule 3.8 because Defendants reside in this district and division and all of the acts described in this Complaint occurred in this district and division.

## PLAINTIFF

12.      Plaintiff Vivian Geraghty is a resident of Canton, Ohio and a citizen of the United States.

13.      Ms. Geraghty was employed by Jackson Local School District as a teacher at Jackson Memorial Middle School until August 26, 2022.

3

# DEFENDANTS

### *Jackson Local School District Board of Education*

14.    Defendant Jackson Local School District ("the District") Board of Education ("the Board") is organized under laws of the State of Ohio and is "a body politic and corporate, and, as such, capable of suing and being sued . . . ."[1]

15.    Under Ohio law, the Board has "management and control of all of the public schools of whatever name or character that it operates in its respective district."[2]

16.    The Board is the "sole authority" in selecting "Textbooks," "Instructional materials" and "Academic curriculum" used in the District.[3]

17.    The Board has authority to set the objectives for each school in the District and to establish the policies that govern each District, including the Policy and practice at issue in this lawsuit.

18.    The Board is responsible for hiring teachers and administrators in the District. The Board hires teachers on recommendation by the Superintendent, or another person the Board may designate to make recommendations.[4]

19.    The Board has authority to end teachers' employment through termination, nonrenewal of contract, or acceptance of resignation. The Board accepted Ms. Geraghty's compelled resignation at its regular meeting on September 20, 2022. A true, accurate, and complete copy of the minutes of the Board's September 20 meeting are attached to this Complaint as Exhibit A.

20.    The Board exercises direct supervision over Defendant DiLoreto.

---

[1] Ohio Rev. Code § 3313.17 (1953).

[2] *Id*. at § 3313.47 (1993).

[3] *Id*. at § 3313.21 (2014).

[4] *Id*. at § 3319.07(A) (2013).

***Christopher DiLoreto***

21. Defendant Christopher DiLoreto is the Superintendent of the District.

22. Defendant DiLoreto is the chief executive officer of the District, and has authority to define and establish practices to achieve the Board's objectives and implement its policies, including the Policy at issue in this lawsuit.

23. Defendant DiLoreto is the Board's primary advisor on personnel matters. For hiring decisions concerning teachers, state law requires the Board to act on a recommendation from the superintendent, or another person designated for this purpose by the Board.[5]

24. On information and belief, the Board has not designated any person other than Defendant DiLoreto to make hiring recommendations, and relies exclusively on Defendant DiLoreto's recommendations.

25. Defendant DiLoreto reports to the Board and exercises direct supervision over Defendants Myers and Carter.

***Monica Myers***

26. Defendant Monica Myers is the Director of Curriculum, Instruction and Assessment for the District.

27. Defendant Myers oversees the selection, development, and implementation of all curricula for grades six through twelve in the District.

28. Defendant Myers oversees professional development for all teachers at schools from grades six through twelve in the District.

29. Defendant Myers assists Defendant DiLoreto in developing policies and practices to implement the Board's objectives and policies, including the Policy at issue in this lawsuit.

---

[5] *Id.* at § 3319.07.

30.    Defendant Myers is responsible for compelling Ms. Geraghty to tender her resignation.

31.    Defendant Myers reports directly to Defendant DiLoreto and directly supervises every middle and high school principal in the District, including Defendant Carter.

***Kacy Carter***

32.    Defendant Kacy Carter is the Principal of Jackson Memorial Middle School.

33.    Defendant Carter is responsible for administration of Jackson Memorial Middle School and exercises authority over teachers in compliance with policies and practices established by the Board, Defendant DiLoreto, and Defendant Myers, including the Policy at issue in this lawsuit.

34.    Defendant Carter is responsible along with Defendant Myers for compelling Ms. Geraghty to tender her resignation.

35.    Defendant Carter reports directly to Defendant Myers and directly supervised Ms. Geraghty until August 26, 2022.

## FACTUAL BACKGROUND

36.    Defendants adopted and continue to maintain a Policy requiring teachers to participate in the "social transition" of students who express a "gender identity" inconsistent with their sex by using names and pronouns consistent with the "gender identity" and inconsistent with the students' legal name and sex. Pursuant to this Policy, Defendants Myers and Carter terminated Ms. Geraghty by forcing her to resign—a compelled resignation accepted by Defendants DiLoreto and the Board.

I.     **Ms. Geraghty successfully taught consistently with her religious practices and scientific understanding.**

37.    Ms. Geraghty taught English Language Arts at Jackson Memorial Middle School from August 2020 until Defendants forced her to resign upon learning of her religious beliefs on August 26, 2022.

38.    Until August 26, 2022, Ms. Geraghty taught her class while remaining consistent with her religious practices and scientific understanding concerning human identity, gender, and sex. In that time, she never faced any kind of complaint about her performance or disciplinary action.

39.    Ms. Geraghty is a professing Christian who strives to live out her faith daily.

40.    According to her Christian faith, Ms. Geraghty has sincerely held religious beliefs that govern her views about human nature, marriage, gender, sexuality, morality, politics, and social issues.

41.    Ms. Geraghty's faith informs her convictions concerning human nature, the purpose and meaning of life, and ethical and moral standards that should govern human conduct.

42.    Ms. Geraghty's faith teaches her that God immutably creates each person as male or female; these two distinct, complementary sexes reflect the image of God; and rejection of one's biological sex is a rejection of the image of God within that person.

43.    Ms. Geraghty also believes she cannot affirm as true those ideas and concepts that she believes are not true. Doing so, she believes, would violate biblical commands against dishonesty and lying.

44.    Ms. Geraghty's faith does not command her to affirmatively communicate her religious beliefs at school, and she did not seek to do so. However,

her faith requires her to refrain from speaking in a manner that her faith instructs is immoral, dishonest, or harmful.

45. Ms. Geraghty's faith does command her to affirmatively communicate her religious beliefs outside of school, and she wishes to communicate freely on other matters of public concern, including human identity, sex, and gender consistent with those beliefs.

46. Ms. Geraghty believes that referring to a child using pronouns inconsistent with the child's biological sex is harmful to the child because it is untrue.

47. Ms. Geraghty endeavors to treat every person with dignity, love, and care, because she believes all people are created in the image of God.

48. In addition to her religious views, Ms. Geraghty understands, based on scientific evidence and her own experience as an educator, that children do not have a fully developed capacity to understand the long-term consequences of their decisions.

49. Ms. Geraghty wants the best for all of her students and wishes to refrain from doing anything that would be harmful to them or create an unreasonable risk of harm to them.

50. In particular, Ms. Geraghty is aware of an increase in students expressing a gender identity that is inconsistent with their sex and an accompanying request to be addressed with a different name consistent with the new identity and pronouns that are inconsistent with their sex.

51. Ms. Geraghty is aware that using the new name and pronouns that a student requests as a part of expressing a new gender identity is called "social transition."

52. "Social transition" is the use of a new name and pronouns to "validate" a gender identity that is not consistent with the person's sex.[6] Social transition "is not a neutral act"—it is an "active intervention" that can have "significant effects on the child or young person in terms of their psychological functioning."[7]

53. Ms. Geraghty understands that many children who at some point express a gender identity inconsistent with their sex will eventually return to expressing an identity in harmony with their sex. For these children, all forms of treatment—whether psychosocial or medical—that "validate" the gender identity inconsistent with the child's sex are harmful, but irreversible forms of treatment are the most harmful.

54. Ms. Geraghty also understands that many children who at some point express a gender identity inconsistent with their sex are more likely to have experienced personal trauma and are more likely to suffer from other forms of mental health problems.

55. Ms. Geraghty wants to protect children from making potentially irreversible and life-changing decisions that they may later regret. Ms. Geraghty believes that, because of the difficulty of assessing matters of gender identity and the long-term irreversible consequences of certain treatments for transgender-identifying people, including puberty blockers, hormone replacement therapy, and sex-reassignment surgery—children should not be encouraged to undertake social or medical transition because of their inability to assess long-term consequences.

---

[6] *See* Leor Sapir, *The School-to-Clinic Pipeline*, City J. (Autumn 2022), https://www.city-journal.org/gender-transistions-school-to-clinic-pipeline.

[7] Hilary Cass, *Independent review of gender identity services for children and young people: Interim report*, 62 (Feb. 2022), https://cass.independent-review.uk/wp-content/uploads/2022/03/Cass-Review-Interim-Report-Final-Web-Accessible.pdf.

56.   Ms. Geraghty objects to personally participating in any child's social transition because she believes that participating in this "active intervention" creates an unreasonable risk of harm to the child, in terms of the immediate impact, the potential irreversible impact of further treatment, and the likelihood that other mental health issues may be overlooked.

57.   Ms. Geraghty also understands, based on scientific evidence, that consistent with all sexually reproductive species, human sex is defined with reference to gamete production and that there are only two sexes, which are male and female.

58.   Because a person is male or female based on sex, not personal identity, Ms. Geraghty believes that addressing a male student as "she" and addressing a female as "he" is dishonest.

59.   Using pronouns inconsistent with a child's sex to address or refer to that child communicates a message—that what makes a child a boy or a girl is that child's personal sense of being a boy or girl rather than the child's sex—that is inconsistent with Ms. Geraghty's scientific understanding and religious beliefs.

60.   Being forced to communicate this message and participate in a student's social transition harms Ms. Geraghty by forcing her to express something she believes is untrue and harmful to her students; and it harms her students by actively contributing to a risk of immediate, negative psychological effects and long-term irreversible physical effects.

61.   Being forced to communicate this message and participate in a student's social transition also harms Ms. Geraghty by undermining her ability to share her faith and express her views on matters of public concern outside of school. If she claims outside school that participation in a social transition communicates something that is false and harmful, but then personally participates in a student's social transition at school, Ms. Geraghty would communicate either: (1) that she

10

does not actually believe that social transition communicates something that is false and harmful or (2) that she is willing to harm children in order to keep her job. Neither is true.

62.     Ms. Geraghty wanted to continue teaching as she always had while refraining from violating her conscience and harming her students by participating in the social transition of two students in her class.

63.     Ms. Geraghty does not discriminate against any of her students on the basis of race, religion, sex, gender identity, sexual orientation, or any other basis that her school or applicable law prohibits.

64.     Ms. Geraghty treats all students equally and addresses students consistent with their birth name and sex. If a student requests to be treated differently, Ms. Geraghty may accommodate the student, but she cannot grant any request to treat the student dishonestly or harmfully. This means she cannot grant a request to participate in a social transition, because she believes that granting that request would be harmful to herself and to the student.

65.     If a student asks to be addressed by a different name and pronouns, Ms. Geraghty would refrain from using any pronouns in the student's presence and would address the student, for example, by last name.

66.     On August 16, 2022, two different students requested that Ms. Geraghty participate in their social transition by using names associated with their new gender identities rather than their legal names. One student also asked to be referenced with pronouns inconsistent with the student's sex.

67.     On August 22, 2022, school counselor Christopher Tracy included Ms. Geraghty on an email to several teachers instructing the teachers to participate in the social transition of the two students referenced in paragraph 66.

11

II.     **Ms. Geraghty approached Defendants with her concerns, but they terminated her as soon as they learned about her religious beliefs.**

68.     On August 26, 2022, at around 9:30 a.m., Ms. Geraghty approached her principal, Defendant Carter, in the hope of reaching a solution that would allow her to continue teaching without violating her religious beliefs and constitutional rights.

69.     Defendant Carter was initially unable to tell Ms. Geraghty exactly what her obligations were, and explained that his own practice was to refrain from using any pronouns to refer to students who express gender identities inconsistent with their sex. Defendant Carter told Ms. Geraghty he would look into the matter further. Ms. Geraghty went to her classroom.

70.     At approximately 10:05 a.m., another school employee came to cover Ms. Geraghty's classroom while she returned to Defendant Carter's office at his request. Defendant Carter was joined by his superior, Defendant Myers.

71.     Defendants Carter and Myers asked Ms. Geraghty about her reasons for being unwilling to participate in the social transition of her two students.

72.     When Ms. Geraghty explained that her views about sex and gender identity were informed by her religious belief, Defendants Carter and Myers inquired further about her beliefs.

73.     After Ms. Geraghty explained her beliefs as set forth in paragraphs 39–47, Defendants Carter and Myers told Ms. Geraghty that "she would be required to put her beliefs aside as a public servant."

74.     Ms. Geraghty explained that she could not put her beliefs aside, and she did not believe she could be compelled to do so as a condition of public service.

75.     Defendant Myers told Ms. Geraghty that her unwillingness to participate in social transition in violation of her faith amounted to insubordination

12

and that continuing to teach without violating her beliefs would "not work in a district like Jackson."

76.     Ms. Geraghty explained that she could not change her mind about her religious views. Defendant Carter sent Ms. Geraghty back to her classroom.

77.     A few minutes later, at approximately 10:30 a.m., Defendants Carter and Myers recalled Ms. Geraghty to Defendant Carter's office.

78.     Defendants Carter and Myers told Ms. Geraghty that if she would not participate in the students' social transition that she must resign effective immediately.

79.     Ms. Geraghty said that she believed forcing her to resign violated her rights under the First Amendment to the United States Constitution.

80.     Defendant Myers reiterated that as a public servant Ms. Geraghty must "set [her] religious convictions aside" and that, if she was unable to do so, she had no choice but to resign.

81.     Defendant Carter immediately handed Ms. Geraghty a laptop and ordered her to draft her letter of resignation in the adjoining room for immediate submission.

82.     Unwilling to violate her convictions and believing she had no other choice, Ms. Geraghty tendered her resignation. A true, complete, and accurate copy of Ms. Geraghty's resignation letter is attached as Exhibit B.

83.     By 11:30 a.m.—within two hours of Ms. Geraghty's initial conversation with Defendant Carter—Ms. Geraghty was escorted out of the building after having been forced to resign.

84.     During Defendants' swift decision to force Ms. Geraghty to resign, there was no discussion of any potential accommodation.

85.     Defendants did not even ask whether there was any possibility that Ms. Geraghty simply avoid pronouns or use last names.

13

86.     Defendants did not explore the possibility of transfer to a different class, although Defendant DiLoreto has discretion to transfer teachers and a transfer would have been feasible, given the total enrollment of 1,350 students at Jackson Memorial Middle School.[8]

87.     Neither did Defendants explore the possibility of transferring the students who were undergoing a social transition, which would have also been feasible.

88.     Ms. Geraghty did not raise the issue of transfer or explore specific potential accommodations because she did not expect that she would be forced to resign as soon as she explained her religious basis for being unable to participate in her students' social transition.

89.     On information and belief, Defendants Carter and Myers consulted with Defendant DiLoreto before ordering Ms. Geraghty to resign.

### III.   Defendants' Policy requires some teachers to participate in social transition of students.

90.     The District's Policy requires some teachers to participate in the social transition of any student that requests it by using names and pronouns consistent with the student's newly-expressed gender identity and inconsistent with the student's legal name and natal sex.

91.     Defendants do not enforce their Policy neutrally or generally: Defendant Carter is allowed to avoid using pronouns to address students who are undergoing a social transition, while Ms. Geraghty was ordered to use both names and pronouns to participate in her student's transition, and then forced to resign when she explained her religious basis for being unable to do so.

---

[8] *See* Jackson Memorial Middle School, *2022-23 Profile*, https://drive.google.com /file/d/1A9UGIDrenpuW6j41w4MHDg4Ojn4xMqv0/view (accessed Dec. 6, 2022).

92.     Under Defendants' Policy, students may select and express any gender identity they choose because the expression is based entirely on an individual student's subjective feelings. The potential range of expression, and therefore, the potential range of terms that a teacher may be obliged to use and validate, is infinite.

93.     Defendants' Policy governs the way a teacher interacts with a student undergoing social transition in any setting, including in settings where the teacher would be otherwise free to engage in personal expression or attend to personal matters.

94.     Using a pronoun when referring to a student expresses a message about that student's sex.

95.     How to respond to individuals with gender dysphoria, or who identify as transgender, is a matter of national and local public debate and concern, including whether it is appropriate to treat males as if they are females and vice versa in matters of personal privacy, pronouns, and sports competitions.

96.     Compelling Ms. Geraghty to participate in social transition forces her to express as true the idea that a female student is actually male by using male pronouns, or vice versa. This compels her to express a message on that matter of public concern and debate, and to personally apply that message as if it was true, when she believes that it is not true.

97.     If students heard Ms. Geraghty use a male pronoun to refer to a female student, or vice versa, they would reasonably understand that she is endorsing the idea that a person can transition to another sex, or that it is appropriate to refer to a female as a male, or vice versa.

98.     Ms. Geraghty's refusal to participate in students' social transition did not interfere with the efficient functioning of the school on any occasion.

99.　　The District's Policy also implements the "unquestioningly affirmative approach" that is contrary to evidence, is being questioned by some providers, and has played a role in the scheduled closure of a major clinic in the United Kingdom.[9]

100.　　Defendants retain unlimited discretion to determine what a teacher's obligations are with respect to social transition, which teachers will incur discipline for expressing reluctance to participate in social transition, and what sanctions to actually impose.

101.　　Defendants treat expressing a religiously-motivated reluctance to participate in social transition *to administrators*, unaccompanied by any incident affecting students, as an offense meriting immediate termination.

102.　　On information and belief, Defendants communicated the circumstances of Ms. Geraghty's resignation to the Board.

103.　　Rather than refusing to accept Ms. Geraghty's resignation because it violated her rights, the Board accepted Ms. Geraghty's compelled resignation on September 20, 2022. *See* Ex. A.

## IV.　Defendants maintain other policies and practices that undermine any claimed basis for summarily terminating Ms. Geraghty.

104.　　Defendants have no legitimate interest in forcing Ms. Geraghty to resign within two hours of learning of her religious beliefs, without any discussion of a potential solution, and while allowing other employees to refrain from using pronouns inconsistent with students' sex.

105.　　Defendants also have no legitimate interest in forcing Ms. Geraghty to resign within two hours of learning of her unwillingness to address students with

---

[9] *See* Jane Andersson & Andre Rhoden-Paul, *NHS to close Tavistock child gender identity clinic*, BBC.com (July 28, 2022), https://www.bbc.com/news/uk-62335665 (noting reviewer's conclusion that "the current model of care," which included an "'unquestioning affirmative approach'" was leaving young people "'at considerable risk' of poor mental health and distress" played a role in the clinic's closure).

new names reflecting a gender transition (or her preference to use a last name in lieu of the new name), because the school itself uses students' legal last names and requires students to use their own legal last names on a daily basis.

106. For example, the school assigns an email address to each student. That email address includes some of the student's legal initials and the students' last name. Students are required to enter their email address—including the students' last name—to access school resources online. Students will enter this address on a daily basis.

107. If a student requests to be addressed by a different, preferred name, the school does not issue students a new email address reflecting the student's preferred name or using the initials from a student's preferred name.

108. Students do not suffer harm as a result of using their own last name, seeing their last name or legal initials, or hearing their last name, and students would not suffer harm as a result of being addressed by last name by Ms. Geraghty or any other teacher.

109. Defendants have no interest in compelling Ms. Geraghty to participate in social transition—an active intervention and form of psychiatric treatment—for any student that makes such a request.

## V. Defendants have no interest in requiring employees to participate in students' social transition.

110. In addition to the policies and practices Defendants maintain that undermine any claimed basis for summarily terminating Ms. Geraghty, Defendants have no other interest in requiring employees to participate in the social transition of any student that requests to be addressed by a different name and pronouns because such a requirement is not supported by any scientific evidence.

111.    Social transition is a form of psychiatric treatment for the condition of "gender dysphoria," a condition defined by the *Diagnostic and Statistical Manual of Mental Disorders* as

A.  A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1.  A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3.  A strong desire for the primary and/or secondary sex characteristics of the other gender.

4.  A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5.  A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6.  A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B.  The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.[10]

---

[10] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* 512–13 (2022) [hereinafter *DSM-5-TR™*].

112.    *DSM-5-TR™*'s diagnostic criteria for gender dysphoria in children are similar, but even more stringent, as they require the patient to manifest more of the indications simultaneously.[11]

113.    Some professionals are beginning to recommend against using social transition for children except in rare cases because "in most cases gender incongruence does not persist into adolescence."[12]

114.    Psychiatric intervention like social transition is often followed by medical intervention in the form of puberty blocking drugs, "hormone replacement therapy," and various forms of surgery. Many of these interventions have irreversible effects, including loss of fertility and sexual function, and *none* of them are supported by sufficient data to determine their long-term effects.[13]

115.    What small data does exist shows that embarking on one form of "treatment" increases the likelihood of undertaking further intervention. As many as 98% of children who took puberty blocking drugs moved on to "hormone replacement therapy," according to studies in the United Kingdom and the Netherlands.[14]

---

[11] *DSM-5-TR™*, *supra* n. 13, at 512.

[12] National Health Service England, *Public Consultation: Interim service specification for specialist gender dysphoria services for children and young people,* 11–12 (Oct. 20, 2022), https://www.engage.england.nhs.uk/specialised-commission ing/gender-dysphoria-services/supporting_documents/B1937iiInterimservice specificationforspecialistgenderdysphoriaservicesforchildrenandyoungpeople22.pdf.

[13] *See* Megan Twohey & Christina Jewett, *They Paused Puberty, but Is There a Cost?* N.Y. Times (Nov. 14, 2022), https://www.nytimes.com/2022/11/14/health/ puberty-blockers-transgender.html.

[14] *Id.* ("most patients who take puberty blockers move on to hormones to transition, as many as 98 percent in British and Dutch studies").

116.    Evidence also shows that children who suffer from gender dysphoria or otherwise express a gender identity inconsistent with their sex experience above-average rates of other mental health problems.

117.    A recent review of treatment protocols for gender dysphoria in the United Kingdom have shown that providers face "pressure to adopt an unquestioning affirmative approach and that this is at odds with the standard process of clinical assessment and diagnosis that they have been trained to undertake in all other clinical encounters."[15]

118.    The review also revealed that "many of the children and young people presenting have complex needs, but once they are identified as having gender-related distress, other important healthcare issues that would normally be managed by local services can sometimes be overlooked."[16]

119.    Defendants' Policy maximizes this risk, since Defendants implement a social transition for any student as soon as that student makes the request and require teachers (except for those Defendants exempt at their sole discretion) to participate in the social transition. This follows the "unquestioning affirmative approach" that practitioners are increasingly recognizing as unnecessarily risky.

120.    Developmentally, there are only two anatomical sex presentations, which are male and female. As in most aspects of human development, there are some disorders of sexual development that cause abnormal physical development. People who suffer from these disorders are not members of a third sex, nor are they members of both sexes, nor are they members of neither sex. Rather, each is a member of one sex or the other, based on the scientifically-ascertainable course his or her development would have taken but for the disorder of sexual development.

---

[15] Hilary Cass, *supra* n. 7, at 17.

[16] *Id.*

20

121.    Nevertheless, Defendants require teachers to validate identities that are inconsistent with sex, and to participate in social transition, which increases the likelihood that a person will also undergo irreversible medical and surgical treatments. Defendants' Policy is, at bottom, based on incoherent and ideological assumptions about sex and gender, not scientific data about human development.

## VI.    Ms. Geraghty is suffering ongoing harm.

122.    Ms. Geraghty was unlawfully put to the impossible choice of either violating her religious beliefs and speaking words her conscience forbids or losing the job that she had worked toward and loved.

123.    Defendants' action against her took away her employment. This in itself is causing her ongoing harm. In addition, Defendants' actions against Ms. Geraghty make it more difficult (if not impossible) for her to secure another teaching position.

124.    For example, Ohio law requires a teacher to secure a recommendation from a superintendent (or other person designated for the purpose of recommending personnel) in order to be considered for employment by a school board.

125.    The State of Ohio also maintains an "educator profile" database that contains each teacher's disciplinary history and requires schools to consult this database "prior to making any hiring decision."[17]

126.    Unless Ms. Geraghty receives the requested declaratory and injunctive relief, Defendants' unlawful actions render it effectively impossible for Ms. Geraghty to secure another public-school position in Ohio.

---

[17] Ohio Rev. Code § 3319.393 (2021).

## ALLEGATIONS OF LAW

127.    At all times relevant to this Complaint, all of the acts, policies, and practices alleged in this Complaint and attributed to Defendants were undertaken and maintained under color of a statute, regulation, or custom of the State of Ohio (i.e., under color of state law and authority).

128.    Defendants knew or should have known that they were violating Ms. Geraghty's constitutional and statutory rights and did violate her constitutional and statutory rights by adopting the Policy and practices requiring participation in social transition and by constructively terminating her employment in retaliation for her exercise of her constitutionally protected right to (1) refrain from expressing Defendants' message about sex and gender identity by refusing to participate in students' social transition, and (2) acting consistent with her religious beliefs without materially disrupting any of the school's operations or functions.

129.    Because Defendants' retaliation against Ms. Geraghty was motivated at least in part by her exercise of constitutionally protected rights, their acts reflect a purpose of infringing on her federally protected rights.

130.    All Defendants also acted with reckless disregard for Ms. Geraghty's constitutionally protected liberties.

131.    The Policy and practices that led to Ms. Geraghty's constructive discharge remain in full force and effect.

132.    Ms. Geraghty is suffering irreparable harm from Defendants' actions, because a retaliatory constructive discharge is an ongoing deprivation of constitutional rights.

133.    Ms. Geraghty has no adequate or speedy remedy at law to correct the deprivation of her rights by Defendants.

22

134.    Defendants have no interest in forcing Ms. Geraghty to participate in students' social transition that outweighs her interest, as a citizen, in refraining from doing so.

135.    Defendants have no compelling interest in compelling Ms. Geraghty to participate in students' social transition.

136.    Any interest Defendants have could be achieved by significantly less restrictive means than by forcing her to participate in students' social transition as a condition of keeping her public employment.

137.    Defendants' Policies and practices also do not give any person adequate notice of the obligations to which they are subject.

## FIRST CAUSE OF ACTION
### Free Speech Retaliation
### (42 U.S.C. § 1983)

138.    Ms. Geraghty repeats and realleges each of the allegations in paragraphs 1–137 of this Complaint.

139.    Ms. Geraghty engaged in constitutionally protected speech by invoking her interest as a citizen in remaining silent on a matter of public concern.

140.    Ms. Geraghty's desire to remain silent by refraining from participating in students' social transition implicates her interest as a citizen because she would never participate in a person's social transition on her own time or at work.

141.    Ms. Geraghty's desire to remain silent by refraining from participating in students' social transition implicates her interest as a citizen because doing so violates her conscience and the sincerely-held beliefs that she maintains as a private citizen.

142.    Ms. Geraghty's desire to remain silent by refraining from participating in students' social transition implicates her interest as a citizen because no amount

of private speech on her own time can counteract the harm that she would cause to her own conscience or to her students by participating in their social transition.

143.    Ms. Geraghty had no valid official duty to participate in students' social transition.

144.    Defendants' Policy and practices relating to students' social transition was not a valid curricular requirement.

145.    Ms. Geraghty wishes to remain silent on a matter of public concern because the issues of human identity, sex, gender, and mental health raised by social transition (and communicated by words within social transition) are hotly contested in society, politics, and academia, both in Massillon, Ohio and throughout the world.

146.    Ms. Geraghty wishes to speak outside of school on the same issues of public concern without having her message undermined by participating in social transition at school in contradiction to her professed beliefs.

147.    Ms. Geraghty's desire to remain silent implicates this matter of public concern because using names and pronouns to participate in social transition takes a specific, identifiable position on this matter—that a person's subjective identity (and not the person's sex) determines whether the person is male or female.

148.    Ms. Geraghty has a strong interest as a citizen in speaking (and refraining from speaking) on this issue consistent with her conscience because it is among the sensitive political topics that occupy the highest rung of constitutional protection and requiring an even stronger showing by the government to outweigh her interest.

149.    But the government has no interest at all that justifies its actions against Ms. Geraghty, since her action never disrupted or undermined any school function and did not place any legitimate interest in jeopardy.

24

150.     Because Ms. Geraghty's strong interest in refraining from speaking on a matter of public concern outweighs any of Defendants' interests in forcing her to participate in students' social transition, she engaged in constitutionally protected activity.

151.     Defendants took adverse action against Ms. Geraghty by constructively discharging her.

152.     Defendants' action amounts to constructive discharge because they told Ms. Geraghty that she had no choice but to resign.

153.     Defendants' action has a causal relationship to Ms. Geraghty's exercise of constitutional rights.

154.     Defendants were motivated at least in part (here, entirely) by Ms. Geraghty's exercise of constitutional rights.

155.     Therefore, Defendants unconstitutionally retaliated against Ms. Geraghty.

## SECOND CAUSE OF ACTION
### Compelled Speech
### (42 U.S.C. § 1983)

156.     Ms. Geraghty repeats and realleges each of the allegations in paragraphs 1–155 of this Complaint.

157.     The Constitution protects Ms. Geraghty's right to speak and to refrain from speaking.

158.     Compelled speech imposes additional harm, and so requires an even more urgent justification.

159.     The government must withstand "exacting scrutiny" in order to furnish this more urgent justification for compelled speech, which requires showing that compelling Ms. Geraghty to speak furthers a compelling interest that could not be secured by significantly less restrictive means.

160.    Defendants have no compelling interest in forcing Ms. Geraghty to participate in students' social transition.

161.    Defendants undermine any claim to a compelling interest in forcing Ms. Geraghty to use pronouns inconsistent with students' sex by allowing other employees, including Defendant Carter, to refrain from using the same pronouns.

162.    Defendants undermine any claim to a compelling interest in forcing Ms. Geraghty to use names inconsistent with the students' legal names (or refrain from using students' last names) because Defendants (a) use students' legal last names themselves and (b) force students to enter their own legal last name when logging into Defendants' online resources.

163.    Defendants could have used significantly less restrictive means by allowing Ms. Geraghty to refrain from using pronouns (as they let other employees do) or using last names (as Defendants themselves do), by transferring Ms. Geraghty to another class, or by transferring the requesting students to a different class.

164.    Because Defendants took adverse action against Ms. Geraghty because of her refusal to speak that did not further any compelling interest while there were significantly less restrictive means available, Defendants fail exacting scrutiny and have violated Ms. Geraghty's right to be free from compelled speech.

### THIRD CAUSE OF ACTION
### Free Exercise of Religion
### (42 U.S.C. § 1983)

165.    Ms. Geraghty repeats and realleges each of the allegations in paragraphs 1–164 of this Complaint.

166.    The Constitution protects Ms. Geraghty's right to freely exercise her religion.

167.    The Constitution requires all of Defendants policies and practices to be neutral toward religion and generally applicable to employees under their authority.

168.    Defendants' Policy and practices respecting social transition are not neutral toward religion because they treat Ms. Geraghty's religiously-motivated refusal to participate in social transition worse than Defendant Carter's decision to refrain from using pronouns inconsistent with students' sex.

169.    Defendants' Policy and practices respecting social transition are not neutral toward religion because they treat Ms. Geraghty's religiously-motivated refusal to participate in social transition by using students' last names worse than the school's own use of last names (and the school's requirement that students themselves enter their last names in school systems).

170.    Defendants' Policy and practices respecting social transition are not generally applicable because some employees, including Defendant Carter, are allowed to refrain from using pronouns inconsistent with a student's sex while Ms. Geraghty's refusal to use the same pronouns resulted in her constructive discharge.

171.    Because Defendants' Policy and practices respecting social transition are neither neutral toward religion nor generally applicable, they must withstand strict scrutiny, which means they must be narrowly-tailored to achieve a compelling state interest.

172.    Defendants undermine any claim to a compelling interest in forcing Ms. Geraghty to use names inconsistent with the students' legal names (or refrain from using students' last names) because Defendants (a) use students' legal last names themselves and (b) force students to enter their own legal last name when logging into Defendants' online resources.

173.    Defendants cannot claim their action was narrowly tailored to achieve any legitimate (let alone compelling) interest because they ignored other available,

27

less restrictive means, including allowing Ms. Geraghty to refrain from using pronouns (as they let other employees do) or using last names (as Defendants themselves do) or by transferring Ms. Geraghty to another class.

174.   Because Defendants enforced their Policy against Ms. Geraghty in a way that was not narrowly tailored to further any compelling interest, Defendants fail strict scrutiny and have violated Ms. Geraghty's right to be free from compelled speech.

175.   Defendants are also obliged to refrain from hostility to Ms. Geraghty's religion and to give her a fair and neutral consideration, unaffected by religious hostility.

176.   Defendants Carter and Myers evinced impermissible religious hostility to Ms. Geraghty by constructively discharging her within two hours of learning of her religiously-motivated objection to participating in students' social transition.

**FOURTH CAUSE OF ACTION**
**Due Process of Law**
**(42 U.S.C. § 1983)**

177.   Ms. Geraghty repeats and realleges each of the allegations in paragraphs 1–176 of this Complaint.

178.   By punishing Ms. Geraghty pursuant to a vague and overbroad Policy and set of practices concerning the obligations of teachers regarding the social transition of students, Defendants have violated Ms. Geraghty's right to due process of law under the Fourteenth Amendment.

179.   Defendants' Policy and practices regarding the social transition of students are overbroad because they restrict, compel, and chill a substantial amount of constitutionally protected speech.

28

180.    Because the realm of potential identities and pronouns is unlimited, Defendants' Policy gives no notice to teachers about which terms must be used and which social transitions must be facilitated.

181.    Defendants' Policy grants unbridled discretion in determining which terms will be mandatory for teachers to use, which teachers must participate in a social transition, which teachers will be punished for refusing to participate in a social transition, and the degree of punishment that will be inflicted on a teacher depending on whether the teacher was motivated by religious belief or some other motive.

182.    The lack of objective criteria, factors, or standards in Defendants' Policy and related practice forced Ms. Geraghty, and is currently forcing all current employees, to guess at whether their speech or desire to remain silent would (or will) result in punishment.

183.    The lack of objective criteria, factors, or standards in Defendants' Policy and related practice renders them unconstitutionally vague and in violation of Ms. Geraghty's right to due process of law under the Fourteenth Amendment.

### FIFTH CAUSE OF ACTION
### Free Exercise of Religion
### (Ohio Const. Art. I § 7)

184.    Ms. Geraghty repeats and realleges each of the allegations in paragraphs 1–183 of this Complaint.

185.    By constructively discharging Ms. Geraghty for her refusal to violate her religious beliefs by participating in her students' social transition, Defendants have violated and are violating her right to free exercise of religion under Article I § 7 of the Ohio Constitution.

186.    The religious convictions Ms. Geraghty revealed to Defendants and with which she sought to live in accordance are sincerely held religious beliefs.

187.    Defendants have substantially burdened Ms. Geraghty's right to
engage freely in her religious practices by constructively discharging her for her
inability to conform to their Policy which forces her, through participation in social
transition, to express views on gender identity that conflict with her religious beliefs
and that force her to violate her conscience and religious convictions by expressing
Defendants' preferred views on gender identity.

188.    Defendants substantially burdened Ms. Geraghty's right to engage
freely in her religious practices by constructively discharging her for her inability to
conform to their Policy which forces her, through participation in social transition,
to express views on gender identity that she believes are dishonest and harmful to
her students.

189.    Under the Ohio Constitution, government regulations that
substantially burden a person's exercise of a sincerely held religious belief are
unconstitutional unless they are narrowly tailored to achieve a compelling state
interest.

190.    Defendants have no legitimate (and therefore no compelling) interest
in forcing Ms. Geraghty to participate in social transition by using names different
from a student's legal name and pronouns inconsistent with a student's sex to
address the student.

191.    Defendants' Policy requiring Ms. Geraghty to participate in her
students' social transition is not narrowly tailored to achieve any legitimate (let
alone compelling) interest, especially because Defendants use students' legal names
in several contexts and allow some employees, including Defendant Carter, to
refrain from using the pronouns a student requests as a part of the student's social
transition.

192.    Defendants' Policy requiring participation in social transition and their
enforcement of that Policy through their constructive discharge of Ms. Geraghty

violates Ms. Geraghty's  right to free exercise of religion as guaranteed by Article I §
7 of the Ohio Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows and
requests the following relief:

A.  A declaratory judgment that Defendants' Policy requiring Ms.
Geraghty to participate in students' social transition is facially
unconstitutional under the First and Fourteenth Amendments to the
United States Constitution and Article I, Section 7 of the Ohio
Constitution;

B.  A declaratory judgment that Defendants' Policy and practices relating
to students' social transition, as applied to Ms. Geraghty, violated her
rights under the First and Fourteenth Amendments to the United
States Constitution and Article I, Section 7 of the Ohio Constitution;

C.  A preliminary and permanent injunction requiring Ms. Geraghty's
reinstatement and prohibiting Defendants' from enforcing their Policy
and practices requiring teachers to participate in students' social
transition.

D.  A preliminary and permanent injunction requiring Defendants, their
agents, officials, employees, and any other person acting on their
behalf to purge (or correct, as law may require) Ms. Geraghty's
personnel file of any reference to her constructive discharge.

E.  Nominal damages from Defendants for the violation of Ms. Geraghty's
rights under the United States Constitution and the Ohio Constitution;

F.      Compensatory damages for lost wages resulting from Defendants'
        violation of Ms. Geraghty's rights under the United States
        Constitution and the Ohio Constitution;

G.      Punitive damages for Defendants' purposeful infringement of her
        federally protected rights;

H.      Plaintiff's reasonable attorneys' fees, costs, and other costs and
        disbursements in this action pursuant to 42 U.S.C. § 1988; and

I.      All other further relief to which Plaintiff may be entitled.

Respectfully submitted this 12th day of December, 2022.

> s/ Matthew J. Burkhart
> Matthew J. Burkhart
> Gallagher Kavinsky & Burkhart LPA
> 8740 Orion Place, Suite 200
> Columbus, Ohio 43240-4063
> Telephone: (614) 885-9022
> Facsimile: (614) 885-9024
> mjb@gkb-law.com
> Ohio State Bar Number 0068299
>
> Tyson C. Langhofer
> P. Logan Spena
> Alliance Defending Freedom
> 44180 Riverside Parkway
> Lansdowne, Virginia 20176
> Telephone: (571) 707-4655
> Facsimile: (571) 707-4790
> tlangofer@ADFlegal.org
> lspena@ADFlegal.org
> *Motions for pro hac vice admission*
> *filed concurrently*
>
> David A. Cortman
> Alliance Defending Freedom
> 1000 Hurricane Shoals Road NE, Suite D-1100
> Lawrenceville, Georgia 30043
> Telephone: (770) 339-0774
> Facsimile: (770) 339-6744
> dcortman@ADFlegal.org
> *Motion for pro hac vice admission*
> *filed concurrently*
>
> *Counsel for Plaintiff Vivian Geraghty*