## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| VIVIAN GERAGHTY, | Case No.: 5:22-cv-02237 |
| Plaintiff, | |
| -vs- | JUDGE PAMELA A. BARKER |
| JACKSON LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al., | |
| Defendants. | MEMORANDUM OPINION AND ORDER |

Before the Court are cross Motions for Summary Judgment filed on February 14, 2024, by Defendants Jackson Local School District Board of Education ("the Board"), Christopher DiLoreto ("DiLoreto"), Monica Myers ("Myers"), and Kacy Carter ("Carter") and by Plaintiff Vivian Geraghty ("Geraghty").  (Doc. Nos. 46, 52.)  Both parties filed Oppositions to each other's Motions (Doc. Nos. 54, 57) and Replies in Support of their own Motions.  (Doc. Nos. 58, 59.)

For the following reasons, the Court GRANTS IN PART and DENIES IN PART the parties' cross Motions for Summary Judgment.

## I.    Background

### A.    Factual Background

#### 1.    Geraghty's Hiring and the 2022 Academic Year

In August 2020, the Jackson Local School District ("the District") hired Geraghty as a long-term substitute teacher at Jackson Memorial Middle School.  (Doc. No. 48 (Geraghty Depo.) at PageID# 1067.)  Geraghty worked as a substitute teacher through the 2020 to 2021 academic year.  (*Id*. at PageID# 1068.)  At the end of the 2021 academic year, Geraghty interviewed for a full-time teacher position at the District, and the District hired her to teach seventh-grade English Language

Arts.  (*Id*. at PageID# 1068, 1073.)  Geraghty taught English through the 2021 to 2022 academic year. (*Id*. at PageID# 1076.)  She received a positive review at the end of the year.  (*Id*. at PageID# 1076-77.)

For students, the 2022 to 2023 academic year began on Monday, August 16, 2022.  (*Id*. at PageID# 1079.)  That year, Geraghty taught three English Language Arts sections.  (*Id*. at PageID# 1080.)  Each of these sections had different students, but the classroom instruction was the same for each section.  (*Id*. at PageID# 1081.)

On the first day of class, two of Geraghty's students—whom the Court will refer to as "Student A" and "Student B"—asked that Geraghty refer to them using names different from their names on the school's roster.[1]  (*Id*. at PageID# 1104, 1106.)  Geraghty understood at the time that Student A's request was part of the student's social transition.  (*Id*. at PageID# 1104-05.)  As for Student B, Geraghty had received background information before the first day of class from one of Student B's teachers from the prior year that Student B was "wanting to transition."  (*Id*. at PageID# 1106.)

Either that first day of class or the following day, Geraghty went to speak with a fellow teacher and mentor, Ramey Mason ("Mason"), about the students.  (*Id*. at PageID# 1121.)  Geraghty told Mason that two of her students "want[ed] to be called by a different name."  (Doc. No. 48-2 (Mason Decl.), PageID# 1323.)  Geraghty explained that she disagreed with the students' requests because of her religious beliefs.  (*Id*.)  During the conversation, Geraghty told Mason that "[she] want[ed] those students out of [her] classroom."  (*Id*.)  Geraghty meant this "as an accommodation for [the] students"

_____

[1]  The Court will refer to the students' requested names as their "preferred names" and their given names as their "rostered names."

(Geraghty Depo. at PageID# 1122), but the statement "shocked" Mason.  (Mason Decl. at PageID# 1323.)

On Monday, August 22, 2022, at 12:52 p.m., Student A sent Geraghty an email with the subject "Using my name in class," which read as follows:

> Hello, Miss Geraghty
>
> I'm emailing you because I prefer to go by [preferred name] instead of [rostered name], I know it's the start of the school year and it's hard to remember names, but I'd really appreciate it if you called me [preferred name].  Thank you for your time.
>
> Kind regards, [Student A]

(Doc. No. 48-1, PageID# 1316.)  Geraghty did not respond to Student A's email.  (Geraghty Depo. at PageID# 1112.)  And she continued using the student's rostered name in class.  (*Id*.)  Geraghty saw that Student A "looked uncomfortable" when she used Student A's rostered name.  (*Id*. at PageID# 1114.)  Geraghty testified that she "was equally uncomfortable . . . because [she] didn't want to do something that was damaging to [Student A] and [she] also didn't want to violate [her] religious beliefs."  (*Id*.)

On Wednesday, August 24, 2022, Student A sent a request to see a school counselor.  (Doc. No. 48-1, at PageID# 1318.)  The student wrote that the reason for the request was "[o]ne of my teachers dead-naming me all the time in class."  (*Id*.)

The following day, Student A's counselor, Christopher Tracy ("Tracy"), sent an email to all of Student A's teachers that year, including Geraghty.  (Geraghty Depo. at PageID# 1116.)  The subject was "Student A" and the email read:

> Hey all!
> I'm not sure if everyone/anyone was aware, but I just met Student A today.  He is transitioning, and actually goes by [preferred name].  So, he would prefer to be called [preferred name] in class!

3

He also goes by he/him/his pronouns as well.

Sorry this is coming a week and a half late or if he's already spoke to you about this. I literally just met him and found this out.

Thanks everyone!

(Doc. No. 48-1, PageID# 1319.)  Geraghty interpreted the email to be a directive since, generally, teachers would follow counselors' guidance about students.  (Geraghty Depo. at PageID# 1117.)  Geraghty knew that she "could not continue at this point calling [Student A] by [Student A's] legal name and [she] wanted to reach a solution on what could be done instead."  (*Id*. at PageID# 1124-25.)  So, she decided to meet with Carter, the middle school principal, "to seek an accommodation so that students would not continue to feel uncomfortable."  (*Id*. at PageID# 1084, 1125.)

### 1.      The First Meeting

On Friday, August 26, 2022, at approximately 9:30 a.m., Geraghty met with Carter.  (*Id*. at PageID# 1125.)  The meeting lasted between 10 and 15 minutes.  (*Id*. at PageID# 1126.)  Geraghty explained that two of her students asked her to call them by their preferred names as part of their social transition.  (*Id*.)  She further explained that she received an email from one of the student's counselors about the student's preferred name and pronouns.  (Doc. No. 55 (Carter Depo.), PageID# 3073.)  She told Carter that her religious conviction would not allow her to agree to their requests.  (Geraghty Depo. at PageID# 1126.)  Carter responded that "if the pronouns are the issue, . . . there are instances where you just don't use pronouns."  (Carter Depo. at PageID# 3074.)  According to Geraghty, she "generally agree[d]" with this statement.  (Geraghty Depo. at PageID# 1126.)  But Carter remembered Geraghty responding that "she still wouldn't be comfortable using preferred names or preferred pronouns because she would know what was behind it." (Carter Depo. at PageID#

4

3074.)  Both agreed that the meeting ended with Carter agreeing to "look into it further" and to then "get back" with Geraghty.  (*Id*.)  Geraghty left the first meeting "feeling that . . . everything was going to be okay."  (Geraghty Depo. at PageID# 1129.)

After the meeting, Carter called Myers (Carter Depo. at PageID# 3097), the District's director of curriculum, instruction, and assessment.  (Doc. No. 56 (Myers Depo.), PageID# 3258.)  Carter briefly recapped his conversation with Geraghty, and Myers responded that she was going to go to Carter's office to speak with him in person.  (Carter Depo. at PageID# 3098.)  As she was leaving the building, Myers told DiLoreto, the District's superintendent, that she was headed to the middle school to meet with Carter.  (Myers Depo. at PageID# 3319.)

Myers met Carter in his office around 10:00 a.m.  (Carter Depo. at PageID# 3098.)  They spoke for 10 to 20 minutes about Carter's previous meeting with Geraghty.  (*Id*. at PageID# 3320.)  Around this time[2], Carter went to speak with Student A's and Student B's counselors.  (Carter Depo. at PageID# 3077.)  He first spoke with Student B's counselor, Joni Craver ("Craver").  (*Id*. at PageID# 3078.)  Craver explained that Student B had made name requests in past school years, but she was not certain if Student B had made a request this year.  (*Id*. at PageID# 3078-79.)  Craver said Student B's mother was aware of and supported Student B's social transition.  (*Id*. at PageID# 3079.)

Carter next spoke to Tracy, Student A's counselor.  (*Id*. at PageID# 3081.)  They discussed the email that Tracy had sent about Student A to Geraghty and Student A's other teachers.  (*Id*.)  Tracy relayed that a parent was aware and supportive of Student A's social transition.  (*Id*. at PageID# 3082.)  Carter then returned to his office and filled in Myers on what each counselor had said about the

---

[2]  Carter could not remember whether he called Myers before or after speaking with the counselors.  (Carter Depo. at PageID# 3097.)  Myers remembered Carter leaving his office to speak with the counselors while she was there.  (Myers Depo. at PageID# 3322.)

5

students.  (Myers Depo. at PageID# 3324.)  Myers and Carter decided they needed to speak with Geraghty further to "understand better how to move forward" and to "find out all the details."  (Carter Depo. at PageID# 3098-99.)  So, a short time after 10:00 a.m., Carter called Geraghty to his office for a second meeting.  (*Id*. at PageID# 3101.)

### 2.    The Second Meeting

Carter began the second meeting by asking Geraghty to share her concerns with Myers. (Myers Depo. at PageID# 3327.)  Geraghty restated her concerns about the two students in her class and the use of their preferred names.  (Carter Depo. at PageID# 3102.)  Carter offered Geraghty an example of how she may be able to work through her concerns.  (*Id*.)  He explained that his son is named John but goes by Jack, and that calling his son Jack is no different than using a student's preferred name.  (*Id*.)  Geraghty responded that she would still know that behind the student's preferred name was a social transition, and thus, based on her religious beliefs, she could not use the student's preferred name.  (Myers Depo. at PageID# 3328.)  Myers then asked Geraghty, "[w]ell, . . . what are your beliefs?"  (*Id*.)  Geraghty responded that she was "apostolic Pentecostal."  (Doc. No. 52-15, PageID# 2842.)  And she explained that she was taught that there are males and females and that the use of preferred names and pronouns contrary to those sexes is against her beliefs.  (Myers Depo. at PageID# 3328.)  Myers responded that if Geraghty "wouldn't comply to use the student's preferred names it was going to be a problem."  (Doc. No. 52-15, PageID# 2842.)  From this point, Carter's, Myers's, and Geraghty's accounts of the meeting differ.

Carter testified that Geraghty said something to the effect that she thinks students at the middle school age are too young to make the decision about social transition, and that it is an adult's job to guide them.  (Carter Depo. at PageID# 3102.)  Carter and Myers expressed that the District "want[s]

to be supportive of our students." (*Id.*)  They then ended the meeting by saying that they "think everybody needs to think about [this] a little more" and had Geraghty return to her class. (*Id.* at PageID# 3103.)

Myers testified that she tried to reiterate to Geraghty that the District has "lots of kids that have preferred names and [Geraghty] didn't have to use pronouns." (Meyers Depo. at PageID# 3329.) Carter also chimed in and said, "there are ways around it," and Geraghty could "just not use [pronouns]" and instead "just use the [student's] preferred name." (*Id.*)  According to Myers, she and Carter told Geraghty that they had to "think on this" and told Geraghty to go back to her classroom. (*Id.*)

According to Geraghty, after she explained her religious beliefs to Carter and Myers and told them that her beliefs are "something that [she's] unwavering on," Myers asked Geraghty if she "knew that taking this stand would count as insubordination." (Geraghty Depo. at PageID# 1130.)  Myers told Geraghty that she "should be prepared to draw [her] line in the sand if that is the conviction [she's] going to stand behind." (*Id.*)  Carter and Myers then dismissed her from the office. (*Id.*)

After Geraghty left, Carter and Myers spoke among themselves for a short time, trying to look at the issue from all perspectives. (Carter Depo. at PageID# 3106.)  In Carter's mind, "the feeling . . . was that [Geraghty] would need to use preferred names." (*Id.* at PageID# 3114.)  Around 10:46 a.m., Carter asked an assistant principal to cover Geraghty's class and called Geraghty back for a third meeting. (*Id.* at PageID# 3110.)

### 3.    The Third Meeting

The accounts of Geraghty, Myers, and Carter concerning this third meeting also differ.

7

According to Geraghty, the third meeting began with Myers asking her if she was willing to call students by their preferred names.  (Geraghty Depo. at PageID# 1136.)  Geraghty responded that she would not.  (*Id.*)  Carter then told Geraghty, "If that is your final decision, then we need a letter of resignation effective today."  (*Id.*)

Carter and Myers recalled that the third meeting began with Myers asking Geraghty if she had had time to think about the situation and the "work-arounds" discussed during the second meeting and whether "she had an opportunity to rethink her position on the use of names."  (Carter Depo. at PageID# 3110; Myers Depo. at PageID# 3337; Doc. No. 52-15, PageID# 2842.)  Geraghty reiterated that she would not use the students' preferred names and pronouns because "she felt like that was lying."  (Myers Depo at PageID# 3337.)  Myers responded that it was not their job to "impose [their] personal views upon children but to support children."  (*Id.*)  At some point, Geraghty asked about her rights.  (Carter Depo. at PageID# 3111.)  Carter and Myers responded that they "were going to accommodate the students."  (*Id.*)  Geraghty repeated that she would not use preferred names and pronouns.  (Myers Depo. at PageID# 3337.)  Myers then said, "That's going to be problematic" and asked Geraghty whether she was "really prepared to draw that line in the sand."  (*Id*. at PageID# 3337-38, 3345-46.)  Geraghty responded, "I don't think I can work for Jackson anymore.  I guess I'll resign."[3]  (*Id*. at PageID# 3346.)  Myers told Geraghty, "If you're going to resign, then I need a letter."  (*Id.*)

---

[3]  Carter testified that these statements occurred in a slightly different order.  According to him, Geraghty first said that she did not think that she could work at the District anymore, then Myers made the "line in the sand" remark, and then Geraghty offered her resignation.  (Carter Depo. at PageID# 3111.)  During her deposition, Myers first recounted the events in the order that Carter did in his deposition, but she later clarified that she made the "line in the sand" statement *before* Geraghty said she could not work at the school anymore.  (*Compare* Myers Depo. at PageID# 3337-38, *with* Myers Depo. at PageID# 3345-46.)

All agreed that Carter and Myers asked Geraghty if she preferred to handwrite or type her resignation.  (Geraghty Depo. at PageID# 1136.)  If she wanted to type it, they offered to get her a laptop to do so.  (*Id*.)  Geraghty asked to type her resignation.  (*Id*.)  Carter offered Geraghty his laptop.  (Carter Depo. at PageID# 3111.)  Geraghty took the laptop into a room adjoining Carter's office, sat at a table, and began typing her resignation letter.  (*Id*.)

Myers checked in on Geraghty a few times to make sure she was okay.  (Myers Depo. at PageID# 3338-39.)  Geraghty finished her letter and brought the laptop back to Carter.  (Carter Depo. at PageID# 3112.)  Carter and Myers then reviewed the letter and stated it "could be printed and signed."  (Doc. No. 52-15, PageID# 2843.)  Carter printed two copies of the letter, and he explained that one copy would go the District's central office and the other copy was for her records.  (Carter Depo. at PageID# 3112.)  Geraghty addressed her letter to the District's superintendent, DiLoreto. (Doc. No. 48-2, PageID# 1330.)  In pertinent part, the letter reads as follows:

> Please accept this letter as a notice of my resignation from Jackson Local Schools as a teacher.  This letter is effective August 26, 2022.
>
> This is due to irreconcilable differences between myself and the Jackson Local School District.  At the beginning of the 2022/23 school year, I was asked to conform to students' gender identities that opposed my religious beliefs.  Unequivocally and unapologetically, I will not do so.  . . .
>
> I have enjoyed my time working at the Jackson Local School District and am saddened that I have been asked to resign over this issue.  While this is not the result that I was hoping for in this issue, as I sincerely enjoyed my job, it was an easy decision to make in resigning.  . . .

(*Id*.)

After Carter gave Geraghty one of the copies of her letter, Myers told her that she needed to collect her keys and laptop.  (Myers Depo. at PageID# 3339.)  Geraghty responded that they were in her classroom.  (*Id*.)  Myers said she would walk with Geraghty to her class.  (*Id*.)  Geraghty asked to

wait until the class change so that she would not run into anyone in the hallways while walking to her classroom.  (*Id*.)

Once the bell rang for the next class period, Myers and Geraghty walked together to Geraghty's classroom.  (*Id*. at PageID# 3340.)  Geraghty gave Myers her laptop and gathered up her things.  (*Id*.)  It looked like too much for Geraghty to carry herself, so Myers radioed Carter for help.  (*Id*.)  The three of them then walked Geraghty to her car.  (*Id*. at PageID# 3340-41.)  Once at Geraghty's car, Myers asked Geraghty if she was okay.  (*Id*. at PageID# 3341.)  Geraghty responded that she was fine and drove off.  (*Id*.)

### 4.    After the Resignation

On Friday, after Geraghty left the middle school, Carter and Myers called DiLoreto to let him know what had transpired.  (Carter Depo. at PageID# 3174.)  DiLoreto asked Myers to bring him Geraghty's resignation.  (Doc. No. 47 (DiLoreto Depo.) at PageID# 910.)  Di Loreto then called Keith Kohmann ("Kohmann"), the union vice president, to advise him that Geraghty had resigned.  (*Id*. at PageID# 914.)   On either that Friday or on Saturday, Kohmann called Deidre Disman ("Disman"), the union president, and told her that Geraghty had resigned over a "gender identity issue."  (*Id*. at PageID# 1864-65.)  After speaking with Kohmann, Disman called DiLoreto and asked to meet with him and Myers on Monday morning.  (*Id*. at PageID# 1869.)

Later Friday evening, Myers texted Carter, "Just can't seem to shake today.  Kinda feel bad but I know it had to happen or would have eventually…"  (Doc. No. 52-2, PageID# 2317.)  Carter responded, "I'm the same way.  I don't think there was any coaching through that one.  Every analogy I gave was not what she wanted to hear.  Ultimately it just wasn't a fit."  (*Id*. at PageID# 2313.)  Myers then replied, "Yeah.  Kinda sad but what had to happen."  (*Id*.)

10

On Sunday, August 28, 2022, Geraghty sent an email to Disman, Kohmann, and the middle school union representatives.[4]  (Geraghty Depo. at PageID# 1148.)  She wrote that she "brought a concern to [Carter] and was forced to resign within two hours of the concern being raised."  (Doc. No. 48-2, PageID# 1331.)  And "[t]he concern was rooted in sincerely held religious convictions over affirming (or not affirming) students' chosen gender identity."  (*Id*.)  She admitted that she "should've had union representation with [her]," but did not think to ask in the moment.  (*Id*.)  She then listed a series of questions, including, "Were my rights violated?"  (*Id*.)

On Sunday, after receiving Geraghty's email, Disman called Geraghty.  (Disman Depo. at PageID# 1871.)  Disman asked Geraghty to go through what had happened on Friday.  (*Id*. at PageID# 1877.)  According to Disman, she asked Geraghty what outcome she was looking for.  (*Id*.)  Geraghty repeated that she did not want to call the students by what they were identifying as.  (*Id*.)  Then Disman told Geraghty that since the Board's meeting was not until next month, she could "get [Geraghty's] resignation pulled and then [they] could work on [the issue.]"  (*Id*.)  Disman asked Geraghty whether she could "call [the students] by their last name until [she] get[s] this figured out."  (*Id*.)  Geraghty responded that no, she would not use the students' last names.  (*Id*. at PageID# 1879.)  So, Disman again asked Geraghty what outcome she was looking for.  (*Id*. at PageID# 1880.)  Geraghty answered that, "[s]he would like those students removed from the classroom."  (*Id*.)  Disman said the District cannot do that, and she asked Geraghty "what do you want me to fight for . . . because . . . right now I want to fight for your job, and then we can figure this out as we go."  (*Id*.)  According to Disman, Geraghty replied that "[s]he [didn't] want her job" and "didn't want to teach."  (*Id*.)

---

[4]  Once Geraghty was hired on as a full-time teacher, she was a member of the teachers' collective bargaining unit. (Geraghty Depo. at PageID# 1068-69.)

11

Disman ended the call by telling Geraghty that she would have a union attorney reach out to her and that she was meeting with DiLoreto and Myers on Monday.  (*Id*. at PageID# 1884.)

Geraghty remembered Disman's phone call differently.  First, she testified that she first spoke with Disman on Monday, after Disman had met with Myers and DiLoreto, not on Sunday.  (Geraghty Depo. at PageID# 1149.)  Second, she testified that Disman told her that she could get her resignation rescinded, but only if Geraghty called the students by what they were asking to be called.  (*Id*. at PageID# 1150.)

On Monday, August 29, 2022, at approximately 7:00 a.m., DiLoreto, Myers, Disman, and Kohmann met in DiLoreto's office.  (DiLoreto Depo. at PageID# 916, 918.)  Disman told the others that she had spoken with Geraghty on Sunday.  (Disman Depo. at PageID# 1891.)  And she said that she told Geraghty that she could "get her resignation pulled, but [Geraghty] declined."  (*Id*.)  Disman stated that she was confused why Geraghty even reached out to her if she did not want her job back.  (Myers Depo. at PageID# 3355-56.)  DiLoreto responded that he "[a]bsolutely" would rescind Geraghty's resignation if she was willing to come and talk through what had happened.  (DiLoreto Depo. at PageID# 919.)  He added that nothing was over until the board took action on Geraghty's resignation.  (*Id*. at PageID# 921.)  The meeting ended with Disman agreeing to reach back out to Geraghty to see if she had changed her mind.  (Disman Depo. at PageID# 1894.)

A few hours after the meeting, DiLoreto sent Geraghty an email titled "Resignation" that read as follows:

> I am writing to inform you I am in receipt of your correspondence of August 26, 2022, as well as a follow up text message to Kacy Carter confirming your resignation from employment on that same date.  On behalf of the School Board, I have accepted that resignation effective as of the end of business, August 26, 2022.

(Doc. No. 15-1.)  DiLoreto did not discuss this email with Disman before sending it to Geraghty. (DiLoreto Depo. at PageID# 925.)

Later that week, Disman called Geraghty to let her know that a union attorney would be contacting her.  (Disman Depo. at PageID# 1897-98.)  During the call, Disman asked Geraghty whether there was "still a way that [she] [could] pull [Geraghty's] resignation," but Geraghty responded that "she wasn't interested in that."  (*Id*. at PageID# 1898.)

### 5.     The District's Policy

After Geraghty filed this lawsuit, Christopher Goff ("Goff"), the president of the Board, published a letter to the community that read, in pertinent part, that the District "**does not have a 'policy'** regarding our teachers and the gender identity of students." (Doc. No. 52-17, PageID# 2913.) DiLoreto, Myers, and Carter all similarly testified about the District's lack of a policy on gender identity.

DiLoreto testified that there is no board policy obligating the District to use a student's preferred name.  (DiLoreto Depo. at PageID# 866, 879, 990.)  Rather, he described it as the District's "practice" to address a student consistent with their request.  (*Id*. at PageID# 884.)

Myers testified that using a student's preferred pronouns and preferred name is an "informal" and "implied" practice at the District.  (Myers Depo. at PageID# 3302, 3314.)  And she stated that the practice is not necessarily "mandatory."  (*Id*.)

Carter testified that the District does not have a "policy" on using preferred names and pronouns.  (Carter Depo. at PageID# 3033.)  Instead, he described it as a "practice" to "honor students' requests for preferred names."  (*Id*.)  And "[t]eachers, staff members, [and] administrators" across the District recognized this practice.  (*Id*. at PageID# 3034.)

Additionally, Mason testified that while teachers attended periodic trainings through the year, none of those had any discussion of gender identity.  (Doc. No. 49 (Mason Depo.), PageID# 1775-76.)  Mason described the District's practice on the use of students' preferred names to be "just understood."  (*Id*. at PageID# 1776.)

### B.    Procedural History

On December 12, 2022, Geraghty filed a Verified Complaint against Defendants together with a Motion for Preliminary Injunction.  (Doc. Nos. 1, 2.)  In her Complaint, Geraghty brings five causes of action.  The first four are under 42 U.S.C. § 1983 and allege free speech retaliation in violation of the First Amendment; compelled speech in violation of the First Amendment; a violation of her First Amendment right to freely exercise her religion; and a violation of the Due Process Clause of the Fourteenth Amendment due to the District's allegedly vague and overbroad policy regarding the social transition of students.  (Doc. No. 1, ¶ 138-183.)  Geraghty's fifth cause of action alleges a violation of her right to freely exercise her religion under Article 1, Section 7, of the Ohio Constitution.  (*Id*. at ¶ 184-192.)

On January 25, 2022, after a short extension, Defendants filed an Answer to Geraghty's Complaint and an Opposition to her Motion for Preliminary Injunction.  (Doc. Nos. 13, 14.)  On February 1, 2023, Geraghty filed a Reply in support of her Motion for Preliminary Injunction.  (Doc. No. 15.)

On February 6, 2023, the Court conducted a telephone conference with the parties' lead counsel.  (Doc. No. 16.)  The parties agreed to mediate the case before the assigned magistrate judge.  (*Id*.)  In the event the parties were unable to resolve the case, the Court set an evidentiary hearing on Geraghty's Motion for Preliminary Injunction for April 13, 2023.  (*Id*.)

14

On March 3, 2023, Geraghty filed a Notice of Withdrawal of Motion for Preliminary Injunction. (Doc. No. 21.) The District agreed that it "would employ Ms. Geraghty as a long-term substitute at the elementary level during the pendency of this litigation in exchange for Plaintiff's withdrawal of her Motion for Preliminary Injunction without prejudice." (*Id*. at PageID# 468.)

The parties continued to mediate the remainder of the case with the magistrate judge, but they were unable to reach a complete resolution. (Doc. No. 25.) So, on April 25, 2023, the Court held a Case Management Conference and set case deadlines. (Doc. Nos. 31, 32.) The parties requested to extend these deadlines several times, which the Court granted. (Doc. Nos. 34, 40, 42, 43.)

On February 14, 2024, the parties filed their respective Motions for Summary Judgment. (Doc. Nos. 46, 52.) On March 15, 2024, they filed Oppositions to each other's Motions. (Doc. Nos. 54, 57.) And on March 28 and 29, 2024, they filed Replies in support of their own Motions. (Doc. Nos. 58, 59.)

On August 2, 2024, Defendants filed a Notice of Supplemental Authority, advising the Court of two recent decisions: *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 2024 U.S. App. LEXIS 18634 (6th Cir. July 29, 2024), and *Kluge v. Brownsburg Cmty. Sch. Corp.*, 2024 U.S. Dist. LEXIS 78340 (S.D. Ind. Apr. 30, 2024). (Doc. No. 60.) On August 7, 2024, Geraghty timely filed a Response to Defendants' Notice. (Doc. No. 61.)

## II.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir.

15

2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

Here, the parties have filed cross motions for summary judgment.  "Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists

and that it is entitled to a judgment as a matter of law." *Peters v. DCL Medical Laboratories, LLC*, 305 F.Supp.3d 799, 814 (S.D. Ohio 2018).  "The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion." *Id*.  Rather, in reviewing cross motions for summary judgment, the court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).  The standard of review for cross motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation.  *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## III.    Law and Analysis

### A.    Initial Matters

Defendants raise two issues that the Court will analyze before the parties' Motions for Summary Judgment.

#### 1.    Failure to Exhaust Administrative Remedies

First, Defendants argue that Geraghty is subject to a collective bargaining agreement that required her to initiate a grievance process, which she did not do.  (Doc. No. 46-1, PageID# 590.) Defendants contend that Geraghty is trying to "circumvent" the grievance process by pleading her case as a section 1983 action, but, in substance, her Complaint "seeks relief only available through her collective bargaining agreement."  (*Id*. at PageID# 590-91.)  Since she did not initiate the grievance process, Defendants argue that Geraghty's claims fail as a matter of law.  (*Id*. at PageID# 592.)

Geraghty responds that she "seeks relief that any public employee, including an at-will employee, could seek" and that "to the extent a public employee collective bargaining agreement seeks to impose an exhaustion requirement in order to vindicate constitutional rights, such an agreement is unenforceable." (Doc. No. 57, PageID# 3475.)

The Sixth Circuit has repeatedly held that "[e]xhaustion of state administrative remedies is not a prerequisite to suit under § 1983" because "§ 1983 contains no exhaustion requirement beyond what Congress provided." *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 445 (6th Cir. 2020) (first citing *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 516 (1982), then quoting *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)); *see also Watkins v. Columbus City Sch.*, 2020 U.S. App. LEXIS 35444 at *5 (6th Cir. Nov. 10, 2020) (affirming a district court that "correctly held" that "§ 1983 does not require that a plaintiff first exhaust his administrative remedies before filing suit"); *Grise v. Stewart Cty. Sch. Sys.*, 2021 U.S. Dist. LEXIS 201181 at *11 (M.D. Tenn. Oct. 19, 2021) ("Plaintiff is correct that she is not required to exhaust administrative remedies prior to filing a § 1983 claim.").

Accordingly, Geraghty's claims may proceed.

### 2.    Expert Report of Stephen Levine, M.D.

Second, Defendants argue that the Court should strike the expert report of Stephen Levine, M.D., because it was not authenticated when Geraghty attached it in support of her Motion for Summary Judgment. (Doc. No. 54, PageID# 2970.)

Geraghty responds that Dr. Levine has now submitted a declaration in support of his report. (Doc. No. 58, PageID# 4580; *see* Doc. No. 57-6, PageID# 4429.) And since Defendants were aware of the report well before the parties filed their respective Motions for Summary Judgment, the Court

18

should not strike it and should consider it in evaluating the parties' Motions. (Doc. No. 58, PageID# 4580.)

Generally, unsworn expert reports are hearsay evidence that a court may not consider when deciding a motion for summary judgment. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 481 (6th Cir. 2008). But courts overwhelmingly find that if a party later attaches a sworn declaration attesting to the accuracy and contents of the report, it cures any technical deficiencies with the original, unsworn report. *See Riveredge Dentistry P'ship v. City of Cleveland*, 2024 U.S. Dist. LEXIS 26292 at *20 (N.D. Ohio Feb. 15, 2024) (subsequent sworn declarations "attest[ing] to the accuracy and contents of [the] expert reports . . . cure any technical deficiencies with the submission of the original, unsworn reports"); *Hope v. Hewlett-Packard Co.*, 2016 U.S. Dist. LEXIS 26878 at *8 (E.D. Mich. Mar. 3, 2016) ("The affidavits affirming the contents of each expert's report cure any technical deficiencies associated with the submission of the original, unsworn reports."); *In re Iron Workers Local 25 Pension Fund*, 2011 U.S. Dist. LEXIS 34505 at *32-33 (E.D. Mich. Mar. 31, 2011) ("The affidavits affirming the contents of each expert's report, however, cure any technical deficiencies associated with the submission of the original, unsworn reports.").

Accordingly, the Court will consider Dr. Levine's expert report.

## B.     First Amendment Claims

The Court now turns to the substance of Geraghty's Complaint, beginning with her First Amendment claims. She brings three retaliation claims under the First Amendment: two under the Free Speech Clause and one under the Free Exercise Clause. Geraghty's first two causes of action allege that Defendants violated her rights to "remain[] silent on a matter of public concern" and to "be free from compelled speech." (Doc. No. 1, ¶¶ 139, 164.) Geraghty's third cause of action alleges

that Defendants' policy on social transition violated her right to freely exercise her religion.  (*Id*. at ¶¶ 166, 174.)

All three causes of action require that Geraghty prove three elements: (1) that she engaged in protected conduct, (2) that Defendants took an adverse action against her, and (3) that the adverse action was taken at least in part because of Geraghty's exercise of the protected conduct.  *Heyward v. Cooper*, 88 F.4th 648, 657 (6th Cir. 2023).  The Court will consider each element in turn.

### 1.    Conduct that the First Amendment Protects

The first element of Geraghty's First Amendment claims requires that Geraghty show that she "engaged in protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  For a free-speech claim, that conduct must be "protected speech." *Myers v. City of Centerville*, 41 F.4th 746, 759 (6th Cir. 2022).  And for a free-exercise claim, that conduct must be "a specific exercise of [her] religion." *Speed Way Transp., LLC v. City of Gahanna*, 2023 U.S. App. LEXIS 5135 at *19 (6th Cir. Mar. 1, 2023).  Whether Geraghty engaged in protected conduct is solely a question of law. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 463 (6th Cir. 2017).

The Court begins with Geraghty's free-speech claim.

### a.    Free Speech

The First Amendment, applicable to the states through the Fourteenth Amendment, protects both "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  That means that while the First Amendment "secures the right to proselytize religious, political and ideological causes," it also "guarantee[s] the concomitant right to decline to foster such concepts." *Id*.

As an initial matter, the Court must determine what "speech" is at issue.

20

Defendants frame Geraghty's speech as "[h]er statements addressing [Student] A and [Student] B by their 'deadnames' during their Language Arts class."  (Doc. No. 46-1, PageID# 597.)

Geraghty argues that her "actual position . . . is that Defendants [sought] to *compel* her to express personal agreement with their preferred message on a matter of public concern."  (Doc. No. 57, PageID# 3478.)

In their Reply, Defendants contend that Geraghty is recharacterizing the facts to suit her claim and that Geraghty "did not request to 'remain silent,' but rather persisted in deadnaming her gender diverse students."  (Doc. No. 59, PageID# 4605.)

The Court disagrees with Defendants that Geraghty's compelled speech claim is a recharacterization of the record evidence.  The summary judgment record is undisputed that Geraghty resigned—whether voluntarily or involuntarily—because she refused to use the students' preferred names and pronouns, not because she "deadnamed" the students.  (*See, e.g.*, Carter Depo. at PageID# 3074 ("[Geraghty] stated that she still wouldn't be comfortable using preferred names or preferred pronouns because she would know what was behind it."); Myers Depo. at PageID# ("[Geraghty] would not use preferred names.  She would not use pronouns because she would know what was behind it.").)

By compelling Geraghty to use students' preferred names and pronouns, Defendants "[sought] to force [Geraghty] to 'utter what [was] not in [her] mind' about a question of political and religious significance."  *303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943)).  Accordingly, the speech at issue was compelled speech.  *Id*.; *see also Tennessee v. Cardona*, 2024 U.S. Dist. LEXIS 106559 at *66 (E.D. Ky. June 17, 2024), *stay pending appeal denied*, 2024 U.S. App. LEXIS 17600 (6th Cir. July 17, 2024) (concluding that

21

a U.S. Department of Education rule requiring that teachers use pronouns that do not correspond to a student's biological sex is compelled speech because it would require teachers to communicate the message that students can have a gender identity inconsistent with their sex at birth).

The Court now turns to the question of whether Geraghty's compelled speech was protected under the First Amendment.

### (1)  Compelled Speech

Since the First Amendment protects "the right to refrain from speaking at all," *Wooley*, 430 U.S. at 714, the government "may not compel affirmation of a belief with which the speaker disagrees." *Hurley v. Irish-American Gay*, 515 U.S. 557, 573 (1995).  Indeed, "[w]hen speech is compelled . . . additional damage is done." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 893 (2018).  This is because "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Id*.  And "the First Amendment tolerates none of that." *303 Creative LLC*, 600 U.S. at 590.

As for teachers, they do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  So, the right against compelled speech extends to them too.  For example, a school board cannot compel teachers and students to salute the flag and recite the pledge of allegiance.  *Barnette*, 319 U.S. at 642.

But "the speech rights of public school employees are [not] so boundless that they may deliver any message to anyone anytime they wish." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022).  While they are private citizens, teachers "are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Id*.  As such, when teachers

22

"make statements pursuant to their official duties, [they] are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  The *Garcetti* rule balances the public teacher's right to "participat[e] in public debate" with the supervisor's need to "ensure that [the teacher's] official communications are accurate, demonstrate sound judgment, and promote the [school's] mission." *Id*. at 422-23.

### (2)  *Garcetti* and Compelled Speech

The threshold question, then, is whether the *Garcetti* rule bars Geraghty's claim.  For the following reasons, the Court concludes that it does not.

First, by its plain language, *Garcetti* only applies to situations where public employees "*make statements*." *Garcetti*, 547 U.S. at 421 (emphasis added).  That is, "the employee must have *spoken*" for *Garcetti* to apply.  *Myers v. City of Centerville*, 41 F.4th 746, 760 (6th Cir. 2022) (emphasis added).  In *Garcetti*, the plaintiff wrote a memo—i.e., spoke—and was punished for it.  Yet here, Defendants allegedly caused Geraghty to resign not for what she said, but for what she refused to say. In this situation, where "a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different." *Janus*, 585 U.S. at 908; *see also Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 741 (Va. 2023) (rejecting view that *Garcetti* applies to compelled-speech cases).

Second, even if *Garcetti* were to apply, Geraghty's compelled speech was not pursuant to her official duties.

Whether speech is pursuant to an employee's official duties "depends primarily on whether the speech is 'ordinarily within the scope of an employee's duties.'" *Ashford v. Univ. of Mich.*, 89

23

F.4th 960, 972 (6th Cir. 2024) (quoting *Boulton v. Swanson*, 795 F.3d 526, 533-34 (6th Cir. 2015)). And to determine whether the employee made the speech pursuant to her ordinary job duties, courts "look to factors like the speech's 'impetus,' setting, audience, and general subject matter.'" *Id.* (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007)).  In *Garcetti*, the Supreme Court explicitly rejected "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." 547 U.S. at 424.  Rather, "[t]he proper inquiry" for this Court "is a practical one." *Id.*

Defendants argue that Geraghty's compelled speech was pursuant to her ordinary job duties because (1) its "impetus" was "to create a safe, secure, and welcoming learning environment" and to comply with U.S. Department of Education policies interpreting Title IX; (2) it directly related to Geraghty's job duties; (3) it was in the classroom and during instruction; and (4) its audience was students and not the general public.  (Doc. No. 46-1, PageID# 596-97.)

Geraghty responds that her compelled speech was not pursuant to her ordinary duties because it (1) went "beyond the scope of any valid official duty" and (2) "deprive[d] [Geraghty] of her ability to express her preferred message 'on [her] own time.'"  (Doc. No. 57, PageID# 3479 (quoting *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010)).)

Defendants seek to reduce the compelled speech at issue to a "non-ideological ministerial task[]."  (Doc. No. 59, PageID# 4607 (emphasis deleted).)  They see the use of preferred names and pronouns as a "standard back-and-forth ritual of greeting" without any meaning.  (Doc. No. 46-1, PageID# 599 (quoting *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684, 707 (S.D. Ohio 2023)).)  But such a sanitized view of language ignores the reality that

24

"titles and pronouns carry a message." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021); *see also Parents Defending Education*, 2024 U.S. App. LEXIS 18634 at *19 ("The pleadings in this case, in fact, underscore that perhaps the single thing on which the parties agree is that pronouns matter."). For Geraghty, using the students' preferred names and pronouns carried the message that she "affirm[ed] [the student's] identity," which was against her religious beliefs and her understanding of biology and "basic human function." (Geraghty Depo. at PageID# 1172.)  For the school, using the students' preferred names and pronouns carried the message that it supported its students.  (Carter Depo. at PageID# 3031; Myers Depo. at PageID# 3280; DiLoreto Depo. at PageID# 859.)  And, most importantly, for the students, using their preferred names and pronouns carried the message that the speaker respected their gender identity.  (*See* Doc. No. 48-1, PageID# 1316, 1319.)

So, the question is not whether using preferred names and pronouns was part of Geraghty's ordinary job duties, but whether it was part of her ordinary job duties to convey (or refuse to convey) the message that those names and pronouns carried.  It was not.  Geraghty was a middle school English Language Arts teacher.  (Geraghty Depo. at PageID# 1073.)  Her job was to teach English to the appropriate state standards.  (Doc. No. 48-3, PageID# 1460.)  It was not her job "to teach anything with regard to LGBTQ issues."  (Geraghty Depo. at PageID# 1085.)  Indeed, "gender identity and sexual orientation" were not part of the middle school curriculum at all.  (Myers Depo. at PageID# 3270.)  Defendants make much of the fact that Geraghty was compelled to speak "in the classroom setting and during class time."  (Doc. No. 46-1, PageID# 596.)  But it is not "dispositive" that Geraghty's compelled speech "took place 'within the office' environment," *Kennedy*, 597 U.S. at 530, because, again, Geraghty did not "shed [her] constitutional rights" when she entered the classroom.  *Tinker*, 393 U.S. at 506.

In short, compelling Geraghty to use students' preferred names and pronouns had nothing to do with "when and how English [was] taught to [her] students." *Evans-Marshall*, 624 F.3d at 340. Accordingly, it was not "in-class curricular speech" or otherwise pursuant to Geraghty's ordinary job duties and, therefore, not barred by *Garcetti*. *Cf. id*. at 342.

### *(3)     Pickering-Connick*

But this does not end the analysis.  The Court must now apply the *Pickering-Connick* framework to determine whether the First Amendment protected Geraghty's compelled speech. *Meriweather*, 992 F.3d at 507-08 (applying *Pickering-Connick* to compelled speech); *but see Janus*, 585 U.S. at 908 (recognizing that "the *Pickering* framework fits much less well where the government compels speech" and that the Supreme Court has "never applied *Pickering*" to a "situation in which a public employer . . . demand[s] that its employees recite words with which they disagree).

Under the *Pickering-Connick* framework, the Court asks two questions: First, was the speech at issue "a matter of public concern?"  *Meriwether*, 992 F.3d at 508 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).   And second, was Geraghty's interest in remaining silent greater than Defendants' interest in "promoting the efficiency of the public services it performs through its employees?"  *Id*. (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

Whether speech involves a matter of public concern turns on the "content, form, and context of a given statement, as revealed by the whole record."  *Id*. (quoting *Connick*, 461 U.S. at 147).  The crux of the analysis is "the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives."  *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1189 (6th Cir. 1995).

26

Defendants argue that "[i]t is undisputed that [Geraghty] could avoid the use of pronouns," so the only issue is whether the use of a preferred name was a matter of public concern." (Doc. No. 46-1, PageID# 599.) They agree that the Sixth Circuit held in *Meriwether* that "pronoun usage can be a matter of public concern in certain settings." (*Id*.) But they argue that the Sixth Circuit's decision was limited to pronouns, not preferred names, and depended on "the context of the course [the professor] was teaching." (*Id*.) And they contend that using a student's preferred name is a "mere salutation[]" that is "more like a mechanical exercise" and Geraghty "only had to use students' names in this mechanical context." (*Id*. (quoting *Parents Defending Education*, 684 F. Supp. 3d at 706).) Therefore, they conclude, Geraghty did not "wade into the gender identity debate" or "express a personal belief about gender identity." (*Id*.)

Geraghty responds that Defendants are incorrect that "this case is only about pronouns." (Doc. No. 57, PageID# 3483.) Geraghty contends that the record shows that she had to "fully accommodate the students," which "indisputably" means that she had to "use both names and pronouns requested by students." (*Id*.) Further, Geraghty maintains that *Meriwether* was not limited to the words at issue—that is, pronouns—rather, it was "about *what the words*, including 'titles and pronouns' convey about 'gender identity.'" (*Id*. (quoting *Meriwether*, 992 F.3d at 507).)

First, the record reflects that Defendants were requiring that Geraghty use both the pronouns and preferred names requested by the students. Geraghty understood during the last meeting that she needed to "accommodate the students," which, in her mind, meant "the whole package—names and pronouns." (Geraghty Depo. at PageID# 1161.) Carter likewise testified that he and Myers told Geraghty during the last meeting that they "were going to accommodate [their] students . . . [and]

27

work with [their] students." (Carter Depo. at PageID# 3111.) And for Carter, supporting the students meant "us[ing] whatever names and pronouns a student asks for." (*Id*. at PageID# 3031.)

And second, even if the case were only about preferred names, the Court disagrees that the holding in *Meriwether* was limited to pronouns being a matter of public concern. A preferred name serves to "validate—or invalidate—someone's perceived sex or gender identity" in the same way a pronoun does. *Meriwether*, 992 F.3d at 509. Geraghty's refusal to address Student A and Student B by their preferred names manifested her belief that "sex is a biological function and that a person's gender identity will always match up with their sex," (Geraghty Depo. at PageID# 1176), in the same way that the *Meriwether* professor's refusal to address a student as a woman "manifested his belief that sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Meriwether*, 992 F.3d at 509. Indeed, it is because preferred names carry a meaning that Student A emailed Geraghty asking Geraghty to use Student A's preferred rather than given name. (*See* Doc. No. 48-1, PageID# 1316.) Otherwise, if the name carried no message, why would it matter what name Geraghty used to address Student A? It did matter to Student A, and it mattered to Student A because names, like titles and pronouns, "carry a message." *Meriwether*, 992 F.3d at 507. Accordingly, when Defendants compelled Geraghty to use the students' preferred names and pronouns, they forced her to "wade[] into a matter of public concern." *Id*. at 510.

The final question is whether Geraghty's "interest in" remaining silent on a "matter[] of public concern" outweighs "the interest of [Defendants], as [Geraghty's] employer, in promoting the efficiency of the public services it performs through its employees." *Gillis v. Miller*, 845 F.3d 677,

684 (6th Cir. 2017) (quoting *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). The burden shifts to Defendants on this final question. *See Kennedy*, 597 U.S. at 532.

"The pertinent considerations for [this] balancing test are whether the statement (1) impairs discipline by superiors or harmony among co-workers, (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or (d) undermines the mission of the employer." *Bennett v. Metro. Gov't of Nashville & Davidson Cty.*, 977 F.3d 530, 540 (6th Cir. 2020) (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)) (internal quotation marks and brackets omitted).

Defendants assert that they have a compelling interest that "teachers teach and do not use their position of trust and authority to impose their religious beliefs." (Doc. No. 46-1, PageID# 600.) Defendants also contend that compelling the use of preferred names and pronouns creates a safe, supportive, and non-discriminatory environment for students. (*Id*. at PageID# 601.) Finally, Defendants maintain that to comply with Title IX, it is necessary that they compel teachers to use students' preferred names and pronouns. (*Id*. at PageID# 602.)

Geraghty responds that Defendants' first alleged interest that teachers do not impose their religious beliefs on students is a "red herring" because Geraghty "just wants to *refrain* from personally expressing Defendants' preferred message about sex and gender." (Doc. No. 57, PageID# 3484.) And Geraghty argues that Defendants' practice of requiring that teachers use students' preferred names and pronouns "actually jeopardizes students' wellbeing rather than supporting them." (*Id*. at PageID# 3484-85.) Finally, Geraghty maintains that Title IX "doesn't require anything about the use of names and pronouns." (*Id*. at PageID# 3486.)

The Court will begin with Defendants' first and third arguments.  As for Defendants' first argument, Defendants may have an interest in preventing Geraghty from "conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred*."  *Lee v. Weisman*, 505 U.S. 577, 605 (1992) (Blackmun, J., concurring).  But Geraghty conveying a message about her religious beliefs is not at issue here.  As explained in section III.B.1.a.(1) above, this case is about Defendants *compelling* Geraghty to "recite words with which [she] disagree[s]."  *Janus*, 585 U.S. at 908.  Geraghty refraining from speaking does not amount to her "impermissibly coerc[ing]" her religious beliefs on her students.  *Kennedy*, 597 U.S. at 540.  "And in no world may a government entity's concerns about phantom constitutional violations justify actual violations of the individual's First Amendment rights."  *Id*. at 543.

As for Defendants' third alleged interest, in *Meriwether*, the Sixth Circuit rejected a similar argument.  It held that Title IX is not implicated unless the "speech inhibited [the students'] education or ability to succeed in the classroom."  992 F.3d at 492.  At most, the record evidence is that Student A "looked uncomfortable" when Geraghty failed to use the student's preferred name.  (Geraghty Depo. at PageID# 1114.)  But discomfort does not rise to the level of "systemic[ally] . . . denying [Student A] equal access to an educational program or activity."  *Meriwether*, 992 F.3d at 511 (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 652 (1999)).  Further, "learning how to tolerate speech . . . is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'"  *Kennedy*, 597 U.S. at 538 (quoting *Lee*, 505 U.S. at 590).  Finally, it is "likely" that Title IX's definition of sex discrimination does not "extend to discrimination on the basis of 'gender identity.'"  *Cardona*, 2024 U.S. App. LEXIS 17600 at *7.

In their Notice of Supplemental Authority, Defendants further argue that in *Parents Defending Education v. Olentangy Local School District Board of Education*, the Sixth Circuit recognized the "deleterious effects of misgendering a student, which reinforces the [District's] interest in preventing misgendered pronoun speech." (Doc. No. 60, PageID# 4616.) *Parents Defending Education* is distinguishable for several reasons. First, the case arrived at the Sixth Circuit on the denial of a motion for a preliminary injunction. 2024 U.S. App. LEXIS 18634 at *9. The preliminary injunction standard of review, and the burdens associated with it, "pervade[d]" the court's analysis. *Id*. at *10. Here, the Court has a full summary judgment record to consider under a decidedly different standard. Second, in determining that the use of non-preferred pronouns cause harm, "the district court relied on evidence that the [defendant] never submitted, including law-review and journal articles, newspaper stories, examples from its other pending cases, and its own personal opinions." *Id*. at *56 (Batchelder, J., dissenting). That is not the case here. Again, the Court has a full summary judgment record before it, to include expert reports submitted by both parties. Lastly, the Sixth Circuit specifically noted that "at the summary judgment stage, the District may need to provide additional evidence regarding the likelihood of disruption from the repeated use of non-preferred pronouns." *Id*. at *18. Thus, the Sixth Circuit did not hold that using a student's non-preferred pronoun is harmful, but only that the district court did not err in concluding that it was harmful based on the limited record before it.

Since neither Defendants' first or third alleged interests are compelling, this case hinges on Defendants' second alleged interest in creating a "safe and supportive environment" for its students. According to Defendants' expert Matt Goldenberg, Psy.D., a teacher "utilizing a student's chosen name and pronoun is a developmentally appropriate task for all educators interacting with students

and increases the likelihood that the student can and will feel motivated to participate in both the classroom and the overall school community."  (Doc. No. 46-4 (Goldenberg Report), PageID# 714.)  Another of Defendants' experts, Katherine Kuvalanka, Ph.D., opines that "not respecting a student's chosen name and pronouns will likely cause them discomfort and distress, thereby also likely negatively impacting their classroom experience, capacity to learn, and overall mental health."  (Doc. No. 46-5 (Kuvalanka Report), PageID# 766.)

Geraghty's expert, Stephen Levine, M.D., paints a different picture.  According to him, "no studies show that the social or medical affirmation of a transgender identity in children (or anyone else) reduces suicide, prevents suicidal ideation, or improves long-term outcomes, as compared to either a 'watchful waiting' or a psychotherapeutic model of response."  (Doc. No. 52-11 (Levine Report), PageID# 2635.)  Further, he opines that "[m]iddle school children are in the midst of intense identity development as they are coming to grips for the first time with their new sexual anatomic and physiological functions."  (*Id.* at PageID# 2651.)  School officials need not interfere with this natural process because they "have little reason to comprehend the complexities of the student's family life, developmental adversities, and private ambivalence and worry about their currently expressed gender identity."  (*Id.*)

The parties' "competing expert opinions present the classic battle of the experts."  *Taylor v. Bristol-Myers Squibb Co. (In re Onglyza)*), 93 F.4th 339, 348 (6th Cir. 2024).  In such a situation, it should be "up to a jury to evaluate what weight and credibility each expert opinion deserves," not a judge.  *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when ruling on a motion for summary judgment.).  To be

32

sure, the question of whether an employee's speech is protected under *Pickering* is a legal question. *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007). But a "jury may, however, resolve some underlying factual questions, which can inform the legal determination of the *Pickering* balancing." *Pucci v. Nineteenth Dist. Court*, 596 F. App'x 460, 470 (6th Cir. 2015) (citing *Donlin v. Watkins*, 814 F.2d 273, 277 (6th Cir. 1987)); *see also Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 905 (9th Cir. 2021) ("While the *Pickering* balancing test presents a question of law for the court to decide, it may still implicate factual disputes that preclude the court from resolving the test at the summary judgment stage."). As the diametrically opposed opinions of the parties' experts demonstrate, "the use of gender-specific titles and pronouns has produced a passionate political and social debate" in this country. *Meriwether*, 992 F.3d at 508. Whether use of student's preferred names and pronouns creates a safe and supportive environment for students is a factual question a jury should decide after hearing the parties' expert testimony.

Accordingly, while the Court concludes that Geraghty's compelled speech was not pursuant to her ordinary job duties, it denies the parties' Motions for Summary Judgment as to the *Pickering* balancing test.

### b.  Free Exercise of Religion

The First Amendment also "requires that the government commit 'itself to religious tolerance.'" *Meriwether*, 992 F.3d at 512 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* 138 S. Ct. 1719, 1731 (2018)). This means that "laws that burden religious exercise are presumptively unconstitutional unless they are both neutral and generally applicable." *Id*. (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877-78 (1990). It is the plaintiff's burden to show that the government's policy is not neutral or generally applicable. *Kennedy*, 597

33

U.S. at 525.  Should she discharge that burden, then the court "will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  *Id*.

### (1)  Neutral and Generally Applicable

Geraghty argues that Defendants' practice was not neutral toward religion or generally applicable for two reasons.  First, she contends that "Defendants will credit some religious objections to preferred names but not objections . . . rooted in a religious belief prohibiting participation in social transition."  (Doc. No. 52-1, PageID# 2299-300.)  To prove her point, she uses the example that "Defendants wouldn't make a Jewish teacher use a preferred name 'Yahweh,' but they will make Geraghty use preferred names in violation of her beliefs."  (*Id*. at PageID# 2300.)  Second, Geraghty argues that Defendants "excuse teachers from the obligation to use 'inappropriate' requested names both for secular reasons (in cases of racial slurs) and religious reasons."  (*Id*.)  Geraghty maintains that this amounts to "a system of individual exemptions, [which is] the antithesis of a neutral and generally applicable policy."  (*Id*. (quoting *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012)).)

Defendants respond that Geraghty's hypothetical "is not proof of anything."  (Doc. No. 54, PageID# 2982.)  And they further assert that their preferred names and pronouns practice "was universally embraced, and aside from [Geraghty], no one objected."  (Doc. No. 46-1, PageID# 604.)

For the following reasons, the Court concludes that Defendants' practice was not neutral and generally applied.

First, and most importantly, it is undisputed that Defendants *did not have a policy*.  Indeed, from the top down, all Defendants are emphatic that they did not have any policies on gender identity. In his letter to the community, Goff, the president of the Board, wrote, in bold and underlined, "[t]he

34

Jackson Local School District does not have a policy regarding our teachers and the gender identity of students." (*Id*. at PageID# 2764.)  And he testified that the District "[doesn't] have any specific policies that cover gender identity." (Doc. No. 52-13 (Goff Depo.), PageID# 2753.)  Nor does it have "any specific policy related to the use of preferred names." (*Id*. at PageID# 2754.)  Rather, he testified that the District has a "practice" of "granting requests when students ask for a different name or pronoun." (*Id*. at PageID# 2784.)  DiLoreto likewise testified that it was a "common practice that ha[d] never been challenged" for the school "to respect a student's wishes regarding the use of a preferred name." (DiLoreto Depo. at PageID# 888.)  Carter too testified that the District had "a recognized practice" that the District would "honor students' requests for preferred names." (Carter Depo. at PageID# 3033-34.)  And Myers testified that for the District it was "an implied practice" that staff would use students' preferred names.  (Myers Depo. at PageID# 3342.)

The lack of a written policy means that the District's practice was "a moving target." *Meriwether*, 992 F.3d at 492.  No one other than Geraghty had ever challenged the practice.  (DiLoreto Depo. at PageID# 887.)  And when she did, it required Carter "to look into it further"  to make sure that he was giving Geraghty "the proper instruction on how she should handle things moving forward." (Carter Depo. at PageID# 3075.)  Carter had to look into it further because before his meeting with Geraghty he had never "discuss[ed] whether there were any factors that would be considered when determining whether or not the [student's] request[ed] name or pronoun was mandatory." (*Id*. at PageID# 3087.)  Nor had he ever discussed "any alternative practices to the use of names or pronouns." (*Id*. at PageID# 3088.)

Defendants dismiss Geraghty's hypothetical of the Jewish teacher and a student preferring to be called Yahweh as "not proof of anything."  However, the Court finds this hypothetical to be a

telling example of how the District denied Geraghty an exemption from its practice that would have been available to another teacher of a different faith.  When asked whether a Jewish teacher could refrain from addressing a student by the student's preferred name Yahweh, DiLoreto responded that, "There would be consideration, absolutely.  As well as trying to inform the student of that, as well, to see what compromise could be made here."  (DiLoreto Depo. at PageID# 894.)  When asked the same question, Carter similarly responded that "it would be a practice of mine in the sense that a conflict for a staff member that would necessitate my call to central office for clarification.  (Carter Depo. at PageID# 3056.)  This hypothetical shows that the District would have provided the Jewish teacher an "individualized exemption" from its practice.  *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537 (1993).  Defendants could not "refuse to extend" this same individualized exemption to Geraghty "without compelling reason."  *Id*.  Yet that is what they did here.

Second, Defendants do not agree whether the District's practice was even mandatory.  Carter indicated that a teacher's "consistent[] and intentional[]" refusal to use students' preferred names and pronouns "could" subject the teacher to "discipline," but it would be a "case-by-case" determination.  (Carter Depo. at PageID# 3136.)  Myers testified that the practice of using students' preferred names and pronouns is "not necessarily mandatory" but "an implied practice that everybody does."  (Myers Depo. at PageID# 3342.)  She further testified that she "[didn't] know" whether a teacher would be "subject to discipline for declining to use [a student's] preferred name."  (*Id*. at PageID# 3293.)  DiLoreto similarly testified that the District's practice was not "enforced" but "embraced" and that it was not "an absolute requirement" but a "best practice."  (DiLoreto Depo. at PageID# 889.)  Further, he stated that it would be "possible for a "deviation from [the District's] practice" to "not lead to discipline."  (*Id*.)

After her first meeting with Carter, Geraghty felt "hopeful" that "everything was going to be okay." (Geraghty Depo. at PageID# 1129.)  But during the second meeting, "the tenor ha[d] changed" and Geraghty understood that "there could be disciplinary action taken." (Geraghty Depo. at PageID# 1133.)  Tellingly, it was during this second meeting that Myers asked Geraghty to explain what exactly her religious beliefs were, which Geraghty did. (Myers Depo. at PageID# 3328.)  By the third and final meeting, Geraghty's refusal to use the student's preferred names and pronouns because of her religious beliefs had become a "line in the sand" for Carter and Myers. (*Id*. at PageID# 3338.)

This testimony shows that the District's policy evolved in real time from Geraghty's first meeting with Carter through her third meeting with Carter and Myers, all of which took place over a few hours on a Friday morning.  Before the first meeting, the District's practice was an "implied" and "embraced" "best practice," and non-compliance with the practice could, or could not, subject a teacher to discipline, to be determined on a "case-by-case" basis.  Yet after three meetings during the morning spanning only a few hours, Geraghty's refusal to comply with the practice had become a "line in the sand," which, once crossed, led to Geraghty's resignation. (Myers Depo. at PageID# 3346.)  This shows that the District was thus "not applying a preexisting policy in a neutral way, but was instead using an evolving policy as pretext for targeting [Geraghty's] beliefs." *Meriwether*, 992 F.3d at 515; *cf. Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) (holding that a vaccine mandate that granted religious exemptions on an individual basis was not neutral and generally applicable).

In short, while the District's practice might look neutral and generally applicable, it was ill-defined and provided the District a discretionary "mechanism for individualized exemptions." *Id*.  Accordingly, it must survive "the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546.

### (2)    Strict Scrutiny

As Geraghty has met her burden in showing that the District's practice was not neutral and generally applicable, the District must now "satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525 (quoting *Lukumi*, 508 U.S. at 546). Ohio courts apply the same standard to free-exercise claims under the Ohio Constitution, so the analysis in this section applies to Geraghty's fifth cause of action as well. *See Humphrey v. Lane*, 728 N.E.2d 1039, 1043 (Ohio 2000). Though this test is less lenient than the *Pickering-Connick* test applied to Geraghty's free speech claim, the same alleged governmental interests are at issue. S*ee Kennedy*, 597 U.S. at 532. And, while the constitutionality of the District's practice is a legal question for the court to decide, "a jury may make factual determinations as to compelling interests and narrow tailoring." *Thomas v. Schroer*, 2016 U.S. Dist. LEXIS 42188 at *14 n.2 (W.D. Tenn. Mar. 30, 2016) (citing *Majeske v. City of Chicago*, 218 F.3d 816 (7th Cir. 2000)).

As explained in section III.B.1.a.(3) above, whether use of students' preferred names and pronouns creates a safe and supportive environment for students is a factual question a jury should decide after hearing the parties' experts' testimonies. Accordingly, while the Court concludes that the District's practice was not neutral and generally applicable, it denies the parties' Motions for Summary Judgment as to whether the District's practice was narrowly tailored to a compelling interest.

### 2.    Harmful Adverse Action

The second element of Geraghty's First Amendment claims requires that Geraghty show that "an adverse action was taken against [her]." *Thaddeus-X*, 175 F.3d at 396. "[A]n adverse action is

38

one that would 'deter a person of ordinary firmness' from the exercise of the right at stake."  (*Id.*)  An example of an adverse action in the employment context is a "discharge."  (*Id.*)

Where an employee is not discharged but rather resigns, the employee's resignation is "presumed to be voluntary." *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004).  But a presumptively voluntary resignation "rise[s] to the level of constructive discharge" when "it is objectively reasonable for the employee to leave under the circumstances."  *Id.*  Accordingly, "[a]n employee can rebut the presumption of voluntariness by demonstrating that 'an objectively reasonable person would, under the totality of the circumstances, feel compelled to resign if he were in the employee's position.'" *Spangler v. Lucas Cty.*, 477 F. App'x 301, 303 (6th Cir. 2012) (quoting *Rhoads v. Bd. of Educ.*, 103 F. App'x 888, 895 (6th Cir. 2004)).  Courts consider the following factors to determine whether a reasonable person would feel compelled to resign:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice she was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether the employee was permitted to select the effective date of resignation.

*Id.* (quoting *Rhoads*, 103 F. App'x at 895).

Defendants argue that the Court should grant summary judgment in their favor because Geraghty has "at most . . . alleged that there were 'purposefully vague' statements implying the threat of future adverse employment action if she continued to be 'insubordinate.'"  (Doc. No. 46-1, PageID# 587.)  Defendants contend that these vague threats are "simply not sufficient as a matter of law."  (*Id.*)  Defendants further argue that "[a]n employee does not have an objectively reasonable belief that they have no choice but to resign when they could initiate a grievance procedure but do not."  (*Id.* at PageID# 589.)

39

Geraghty responds that Defendants constructively discharged her because there was "a direct demand for [her] resignation *without* more process as the alternative." (Doc. No. 57, PageID# 3490.) And Geraghty argues that such "[a] direct order to resign is even more egregious when the alternative is an immediate surrender of a constitutional right." (*Id*. at PageID# 3491.) Geraghty asks that the Court grant her summary judgment because the only conclusion that a rational trier of fact can draw from Defendants telling Geraghty "we need a letter of resignation effective today" is that "Defendants constructively discharged [her]." (Doc. No. 52-1, PageID# 2302.)

For the following reasons, the Court concludes that there is a genuine dispute of material fact regarding whether Geraghty involuntarily resigned. The Court will consider each *Rhoads* factor in turn.

The first *Rhoads* factor is whether Defendants gave Geraghty some alternative to resignation. According to Geraghty, her third meeting with Carter and Myers began with them asking her whether she was "willing to call the students by their preferred names." (Geraghty Depo. at PageID# 1136.) Geraghty said that she was not. (*Id*.) Carter and Myers responded, "If that is your final decision, then we need a letter of resignation effective today." (*Id*.) Several hours after Geraghty submitted her resignation, Myers texted Carter that she "kinda f[elt] bad" about Geraghty's resignation, but she knew "it had to happen or would have eventually." (Doc. No. 52-2, PageID# 2317.) Carter responded that he felt the same way and that Geraghty "[u]ltimately . . . just wasn't a fit" for the District. (*Id*. at PageID# 2313.) Myers then reiterated that it was "[k]inda sad but what had to happen." (*Id*.) These exchanges show that Geraghty's resignation was inevitable so long as she refused to call the students by their preferred names and pronouns. Thus, when the evidence is viewed in the light most favorable to Geraghty, Defendants gave Geraghty no alternative to resignation. As Geraghty puts it in her

40

Motion, Defendants presented her a "Hobson's choice" between continuing to work under conditions that offend her religious beliefs and resignation, which is really no choice at all.  (Doc. No. 52-1, PageID# 2301 (quoting *M.P.C. Plating, Inc. v. NLRB*, 912 F.2d 883, 887 (6th Cir. 1990)) ("The second [type of constructive discharge] involves a situation in which an employer confronts an employee with the Hobson's choice of either continuing to work or foregoing the rights guaranteed him under Section 7 of the [National Labor Relations] Act.").)

But when viewed in the light most favorable to Defendants, the evidence shows that Geraghty intentionally chose not to pursue any of the alternatives to resignation available to her.  Carter and Myers both testified that Geraghty was the first to use "the word resign or resignation," not them.  (Carter Depo. at PageID# 3113; Myers Depo. at PageID# 3346.)  And Geraghty admitted that neither Carter nor Myers threatened that she would be terminated if she did not resign.  (Geraghty Depo. at PageID# 1140.)  Further, when Disman offered to "get [Geraghty's] resignation pulled" so that she could work with the District on the issue, Geraghty unequivocally refused and said she did not want her job and did not want to teach.  (Disman Depo. at PageID# 1877, 1880.)  Moreover, Geraghty admitted that she never asked for union representation during any of her meetings with Carter and Myers, that she never asked for an opportunity to speak with a lawyer, that she never asked to speak with DiLoreto, and that she never asked to speak with the Board.  (Geraghty Depo. at PageID# 1131-32, 1145-46.)  In sum, from Defendants' perspective, Geraghty had alternatives to resignation, but she intentionally chose not to pursue them.

Accordingly, there is a genuine dispute whether Defendants gave Geraghty an alternative to resignation.

41

The second factor is whether Geraghty understood the nature of the choice she was given.  As written above, from Geraghty's perspective, the choice Defendants gave her was to "compromise [her] religious beliefs or resign."  (Geraghty Depo. at PageID# 1137.)  Constructively, for Geraghty, that meant resignation "was [her] only option."  (*Id*. at PageID# 1142.)  So, when Carter and Myers told her that they "need[ed] a letter of resignation effective today," Geraghty believed that she had no choice but to comply and resign.  (*Id*. at PageID# 1136.)  Stated simply, it was impossible for Geraghty to understand a choice that Defendants did not give her.

Yet when viewed in the light most favorable to Defendants, the evidence shows that Carter and Myers offered Geraghty a choice, and that Geraghty understood her choice.  Both Carter and Myers testified that they gave Geraghty several "workarounds" to her religious objections, but before they could even discuss those workarounds, Geraghty "offered up her resignation."  (Carter Depo. at PageID# 3116; Myers Depo. at PageID# 3343.)  In other words, from Defendants' perspective, they gave Geraghty the choice to either work with them and "giv[e] [the workarounds] a try" or to resign. (Meyers Depo. at PageID# 3345, 3336.)  Geraghty chose to resign.  (*Id*. at PageID# 3345.)

Therefore, like the last factor, there is a genuine dispute whether Geraghty understood the nature of the choice she was given (and whether she was given any choice at all).

The third factor is whether Geraghty was given a reasonable time in which to choose.  It is undisputed that approximately three hours elapsed between when Geraghty first met with Carter and when Geraghty submitted her resignation.  (*See, e.g.*, Doc. No. 52-15, PageID# 2841-43.)  In *Rhoads*, the plaintiff had approximately seven hours to choose between resignation and termination.  103 F. App'x at 895.  While the court found that this amount of time was "perhaps not as lengthy as [the

plaintiff] would have liked," the plaintiff "was not pressured to make her decision immediately or otherwise coerced into making an informed judgment." *Id*.

Here, when the evidence is viewed in the light most favorable to Geraghty, it shows that she had far less time to decide than the plaintiff in *Rhoads* and that Defendants pressured her to make her decision effectively immediately.  Geraghty testified that she left her first meeting with Carter feeling that "everything was going to be okay" and that she and Carter "would work through a solution together." (Geraghty Depo. at PageID# 1129, 1141.)  But in the second meeting, which began about a half hour later, "the tenor ha[d] changed." (*Id*. at PageID# 1132.)  From Geraghty's perspective, "it didn't appear that [Carter and Myers] wanted a solution" at that point.  (*Id*. at PageID# 1141.)  At the end of the second meeting, Geraghty understood the decision that she had to make "was between choosing [her] religious convictions or compromising [her] religious convictions." (*Id*. at PageID# 1132.)  Carter and Myers dismissed Geraghty from the second meeting only to call her back five minutes later for the third meeting.  (*Id*. at PageID# 1135.)  Shortly into that third meeting, after Geraghty stated that she would not call students by their preferred names, Carter told Geraghty that he "need[ed] her letter of resignation effective today." (*Id*. at PageID# 1136.)  Geraghty understood that "there was no option for additional time." (*Id*. at PageID# 1138.)  So, she submitted her resignation. (*Id*. at PageID# 1144.)  And in her resignation letter, Geraghty wrote that she was "asked to resign" over the issue of using students' preferred names and pronouns and that her resignation was effective as of the day that she wrote it.  (Doc. No. 48-2, PageID# 1330.)  Carter and Myers reviewed Geraghty's letter, and neither disputed its contents.  (Doc. No. 52-15, PageID# 2843*; see also* Carter Depo. at PageID# 3161; Myers Depo. at PageID# 3347.)

43

The  following  Monday,  DiLoreto  met  with  Disman.    At  the  conclusion  of  that  meeting, Disman told DiLoreto that she was going to reach back out to Geraghty "to see if she changed her mind" about her resignation.  (Disman Depo. at PageID# 1894.)  Yet only a couple of hours later, DiLoreto sent Geraghty an email accepting her resignation on behalf the Board.  (DiLoreto Depo. at PageID# 922-923.)  When Geraghty received DiLoreto's email, she understood that her resignation "was final," even if the Board had not yet acted on her resignation.  (*Id*. at PageID# 1147-48.)

But when viewed in Defendants' favor, the evidence shows that Geraghty had—or could have had—a reasonable time to choose but instead decided to immediately resign.  According to Carter, during the third meeting, he specifically asked Geraghty whether she "had time to think about" the workarounds that they discussed during the second meeting.  (Carter Depo. at PageID# 3115.)  But before they could even discuss those workarounds, Geraghty "offered up her resignation."  (*Id*. at PageID# 3116.)  And Geraghty herself admitted that she never asked for additional time to make a decision.  (Geraghty Depo. at PageID# 1138.)  Further, Disman testified that Geraghty twice rejected her offer to "pull" Geraghty's resignation, even after Disman explained that "nothing is really official until it's approved by the board."  (Disman Depo. at PageID# 1878, 1880, 1898.)  DiLoreto testified that Geraghty "[a]bsolutely" could have rescinded her resignation had she chosen to.  (DiLoreto at PageID# 919.)  And he reiterated that Geraghty's resignation was not "over . . . until the board [took] action," which did not happen until September 20, 2022, over three weeks later.  (*Id*. at PageID# 921, 925.)  Thus, from Defendants' perspective, Geraghty could have requested additional time before submitting her resignation, and even after Geraghty submitted it, she had three weeks before the Board met during which she could have rescinded her resignation.  *See Kirk v. Hockenberry*, 2016 U.S. Dist. LEXIS 11392 at *16-17 (S.D. Ohio Feb. 1, 2016) (finding that the plaintiff had a reasonable time to

decide because, in part, the plaintiff "had another two weeks before the School Board met to formally accept his resignation during which he could have withdrawn his resignation but did not").

Therefore, this third factor is also in genuine dispute.

The fourth and final factor is whether Geraghty was permitted to select the effective date of her resignation. According to Geraghty, Carter and Myers told her that her resignation had to be "effective today." (Geraghty Depo. at PageID# 1136.) Yet Carter testified that neither he nor Myers told Geraghty that her resignation needed to be effective immediately. (Carter Depo. at PageID# 3120.) Rather, Geraghty herself decided that it would be effective immediately. (*Id*.; *see also* Myers Depo. at PageID# 3347.) Therefore, there is a genuine dispute whether Defendants permitted Geraghty to select the effective date of her resignation.

As all four factors are in genuine dispute, the Court denies both parties' summary judgment motions on this element.

### 3. Protected Conduct Caused Adverse Action

The third and final element of Geraghty's First Amendment claims requires her to show that "there [was] a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [the] protected conduct." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). The parties do not directly address the causation element in their Motions. Since, as explained above, there are genuine disputes about whether there was protected conduct (element one) and whether there was an adverse action (element two), the Court denies the parties' Motions for Summary Judgment on this third element.

45

C.      **Due Process Claim**

Geraghty's fourth cause of action alleges that the District's preferred name and pronoun practice is "vague and overbroad" in violation of the Fourteenth Amendment's Due Process Clause. (Doc. No. 1, ¶ 178.)  A policy or practice "is so vague as to violate due process when it either (1) fails to inform ordinary people what conduct is prohibited, or (2) allows for arbitrary and discriminatory enforcement.  *Meriwether*, 992 F.3d at 517-18 (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). In the employment context, such as here, "[t]here is 'substantially more room for imprecision in regulations . . . than would be tolerated in a criminal code.'"  *Id*. (quoting *Dade v. Baldwin*, 802 F. App'x 878, 885 (6th Cir. 2020)).  So, "[e]ven where First Amendment values are at stake, 'employment standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk' of discipline." *Id*. (quoting *Dade*, 802 F. App'x at 885.)

Geraghty does not dispute that she received an email from Student A's guidance counselor telling her and Student A's other teachers to use Student A's preferred name and pronouns.  (Geraghty Depo. at PageID# 1124.)  Geraghty testified that she understood that "anything that came from the guidance office, teachers were just supposed to follow."  (*Id*. at PageID# 1117.)  While she did not know if there was a written policy stating as such, "it was the practice," as she understood it, to follow a counselor's instructions "[e]specially when it [came] to student treatment."  (*Id*.)  Therefore, Geraghty interpreted the counselor's email as a directive.  (*Id*. at PageID# 1117-18.)  And according to Geraghty, after her second meeting with Carter and Myers, she thought that if she did not use the students' preferred names and pronouns, she "would face discipline."  (*Id*. at PageID# 1130.)

46

Geraghty was therefore "clearly on notice that the policy applied to [her]" and that it required her to use the students' preferred names and pronouns.  *Meriwether*, 992 F.3d at 518.  Accordingly, she "may not challenge it for vagueness."  *Id*. (citing *Parker v. Levy*, 417 U.S. 733, 755-56 (1974)). The Court grants Defendants' Motion for Summary Judgment on this claim.

### D.      Official Capacity

Defendants argue that Geraghty's claims against DiLoreto, Myers, and Carter are against them in their "official capacity" and therefore duplicative with her claims against the Board.  (Doc. No. 46-1, PageID# 610-11.)  Geraghty "does not dispute the dismissal of her official capacity claims against the individual Defendants," but only to the extent that the individual Defendants' conduct is attributable to the Board.  (Doc. No. 58, PageID# 4591.)  Defendants, however, do not stipulate that the individual Defendants acted pursuant to the Board's policy or practice.

In general, official-capacity claims "represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).  However, "it does not appear that the Sixth Circuit affirmatively requires the dismissal of official capacity claims against an official when the government entity is also a party to the suit."  *Baker v. Cty. of Macomb*, 2015 U.S. Dist. LEXIS 129936 at *26 (E.D. Mich. Sep. 28, 2015).  Rather, when the Sixth Circuit has affirmed the dismissal of official-capacity claims, it has done so because "the plaintiff fail[ed] to demonstrate that a policy or custom of the defendant government entity played a part in the violation."  *Baar v. Jefferson Cty. Bd. of Educ.*, 476 F. App'x 621, 635 (6th Cir. 2012) (collecting cases).  As Geraghty has not failed to so demonstrate here, the Court denies Defendants' Motion for Summary Judgment on this issue at this time.

47

IV.     **Conclusion**

For the foregoing reasons, the Court grants in part and denies in part the parties' cross Motions for Summary Judgment.  (Doc. Nos. 46, 52.)  Specifically, the Court concludes that Geraghty's compelled speech was not pursuant to her ordinary job duties and that the District's name and pronoun practice was not neutral and generally applied.  But it withholds deciding whether the *Pickering* balancing test and strict scrutiny weigh in Plaintiff's favor or Defendants' favor until a jury makes factual determinations regarding the alleged interests at stake.  Further, the Court concludes that there are genuine disputes of material fact about whether Geraghty involuntarily resigned and, if she did, whether her protected conduct (if there was any) caused her to resign.  Lastly, the Court grants Defendants' Motion for Summary Judgment as to Geraghty's due-process claim, but it denies their request to dismiss Geraghty's official-capacity claims against the individual Defendants.

**IT IS SO ORDERED.**


Dated: August 12, 2024                              *s/ Pamela A. Barker*
                                                    PAMELA A. BARKER
                                                    UNITED STATES DISTRICT JUDGE

48